MOORE *v.* STATE.

In Banc. June 13, 1949.

No. 37028. (41 So. (2d) 368).

Quinn & **Stockdale**, for appellant.

**R. O. Arrington,** Assistant Attorney General, for appellee.

**McGehee, C. J.**

The precise question involved on this appeal is whether or not two confessions made by the defendant of the crime of murder, of which he was convicted and sentenced to death, were made freely and voluntarily. These two confessions and other testimony in the case disclosed the following facts:

On the afternoon of January 27, 1948, the defendant Arthur Moore came to the conclusion that he wanted some money and that he would get it by force and violence. To that end he obtained an ordinary claw hammer and went into Valley Street, in the City of Jackson, where he found parked at the curb an automobile which he recognized to be that of Mr. J. L. Dean, an insurance man who collected premiums on life insurance policies in that vicinity. Mr. Dean had temporarily absented himself from the car to make a collection. The defendant stealthily entered the car, laid down on the floor immediately behind the front seat thereof, and waited about fifteen minutes for the return of his intended victim.

After Mr. Dean had returned to the car and while he was occupying the front seat behind the steering wheel he was violently struck with the hammer on the top of his head and was then struck the second blow, which resulted in his slumping over on the seat of the car.

Thereupon the defendant went around to the left door, opened it, got behind the steering wheel, drove the car out of the City, carrying his victim with him, and along one of the main state paved highways for approximately one mile after leaving the corporate limits, turned off onto another hard-surface road and traveled the same for about a mile or a mile and a half and then turned onto a not much traveled gravel road and proceeded for about another mile and a half until he thought that his victim had begun to revive from the shock of his injuries, stopped the car, struck him several more blows with the hammer, took his purse from his pocket and removed therefrom three $5 bills, three $10 bills, three $20 bills and two $1 bills, and then climbed over the dead body, got out of the car and let the body fall onto the ground near the ditch at the right side of the road.

It is further shown that the defendant thereupon left the scene of his crime, threw the hammer away into the grass, weeds and other undergrowth when he had walked about seventeen steps from the car, and threw the purse

to the ground when he had reached a point about seventy-five yards from the car, and then proceeded to where there was some water nearby and attempted to wash the blood from his trousers which he had gotten on his knee as he climbed out of the car over the body of the deceased.

Thereafter he proceeded back into the corporate limits of the City, attended a picture show, visited a cafe where he bought some hamburgers, and then went home, after having hidden in a tin can most of the money that he had thus stolen in the murder and robbery of Mr. Dean.

On March 8th thereafter the defendant was taken into custody by two city police officers for questioning in connection with an attempt then being conducted to solve other crimes which had been committed in the city. He was arrested at his home, not far from Valley Street, in the presence of his father and mother, and was carried to the police headquarters at about 5:30 P. M. on that day. During the intervening forty days following the murder of Mr. Dean several suspects had been arrested, questioned and released from custody in connection with the Dean murder case, that is to say they neither confessed the crime freely and voluntarily nor were they coerced to do so by the police officers, so far as the record shows.

Upon arrival at the police headquarters the two arresting officers proceeded to question the defendant for about an hour in regard to the other crimes that they were investigating and it was shown at a hearing before the trial judge and in the absence of the jury during the trial of the Dean murder case, that the defendant freely confessed his commission of two of the other crimes during that hour of questioning.

Thereupon it is shown that these two officers placed the defendant in a prison cell at the city jail, went home for supper, and, according to the State's evidence, were gone for about an hour (but according to the testimony of the defendant before the trial judge in the absence of the jury they were gone for about two hours), and then resumed their questioning about the details of the

two crimes confessed by the defendant and other crimes in regard to which he had made no confession, and also, after such return from supper, they finally questioned him in regard to the Dean case.

It is undisputed that he admitted at about 9:30 o'clock that evening of March 8, 1948, the murder of Mr. Dean on January 27, 1948. The record is altogether silent as to how long or how many questions were asked the defendant before he confessed the murder of Mr. Dean. Therefore, no such prolonged questioning of the defendant occurred in this case as is said to have occurred in the case of Haley v. Ohio, 332 U. S. 596, 68 S. Ct. 302, 92 L. Ed. 224, and other similar cases.

After the defendant had admitted the murder of Mr. Dean in the instant case at approximately 9:30 of the evening of his arrest, he went with these officers over the route which he had traveled with the body of his victim, showed them where to turn from the main through paved highway onto the other paved road, showed them where to turn onto the graveled road where the car and the body were found, even to the extent of calling their attention to the fact that they had passed the turn-off graveled road and caused them to back their car to the extent necessary to enter upon the same, and then showed them the point on the graveled road where he had left the car and the body, which had been first discovered forty days prior thereto by Dr. Chadwick and reported to the county officials.

After the foregoing procedure had taken place these officers returned to the police headquarters and notified the chief of police of what had occurred and of the fact that the defendant was willing to make a written statement in regard thereto. Thereupon they were advised by the chief of police to summon some private citizens to be present in company with the officers when such statement should be given. This was done and there were present at the taking of the confession an employee of a local hotel, some employees of the American Railway

Express Company, the City Editor of one of the leading daily newspapers of the capital city, and Rev. G. W. Staffney, a local colored minister of the gospel, who had been requested by the chief of police himself to be present, after the minister had been advised of the purpose for which his presence was desired.

After sufficient time had intervened for this group of eleven witnesses to assemble at police headquarters, the written confession was taken in question and answer form. No stenographer was present and about half of the questions and answers were typed by the Chief of City Detectives and the remainder by the city editor of the daily newspaper. It, therefore, consumed about an hour and a half for taking accurately the questions and answers involved. The defendant is shown to have understood what had been transcribed and he fixed his signature thereto and the same was attested in the presence of the eleven witnesses, who were present during the inquiry and who signed as witnesses to the signature of the defendant. The colored minister of the gospel who was present, participated in the questioning and among other things he asked the defendant, as shown in the confession itself, whether or not prior to the assemblage of these witnesses and the beginning of the statement which he was giving, anyone had threatened, mistreated or made any promises to him in regard thereto, and the defendant answered, "No, sir." The minister affirmatively testified at the trial that all statements made on that occasion by the defendant were free and voluntary.

The defendant did not testify before the jury as a witness in his own behalf, but testified before the trial judge, in the absence of the jury on the preliminary inquiry into the voluntariness of the confession, that the two officers who arrested him had scared him and that he at first denied having killed Mr. Dean; that they threatened to take him over on the river and hang him. He also testified in regard to a confession which he gave to the county officials on the 9th or 10th of March, 1948,

after he had been turned over to the county officials by the city police officers, that the county officers had threatened to beat him if he did not confess. All of the officers involved denied under oath before the trial judge that any such thing had happened, and, of course, there was no occasion for the county officers to have threatened him if he did not make a confession, since they knew that he had already made one in writing in the presence of eleven witnesses at the police headquarters as to the full details of the crime a day or two before the county officers received him in custody.

On the afternoon Mr. Dean was killed and murdered the sheriff's office of the County was notified by Dr. Chadwick, who had passed the scene shortly after the murder, and two of the sheriff's deputies went immediately to the scene. One of the deputies testified that on that occasion he found the hammer in question at the place hereinbefore mentioned and that on the next day he and the sheriff revisited the scene and found the dead man's purse at the place hereinbefore stated; that there was a piece of tape wrapped around the handle of the hammer and that there were two tacks driven into the handle; that after the defendant had been delivered into the custody of the county officials about forty days after the crime had been committed, and after he had made the confession at the police headquarters a day or two before, he went with the said deputy and the sheriff over the route which he had traveled on the occasion of the murder, told them where to turn from one highway into another, and where to stop for the scene of the crime, the car and the body having been removed forty days prior thereto, and that the defendant walked to within two steps of where the hammer had been found to point out the place where he had thrown it and that he also carried them to where he had thrown the purse, and then to the hole of water some little distance away where he tried to wash the blood from his trousers; that the defendant described the hammer, as to how the handle thereof was

wrapped with tape and which had been tacked down with two tacks, at a time when the hammer was under lock and key at the sheriff's office and at a time when he had not seen it since he had used it in the commission of the crime.

The defendant also told some of the officials where he went to a picture show from the scene of the crime, told them what picture was being shown and these officials testified that their check-up disclosed that he had correctly named the particular picture shown on that afternoon at an open air theatre which was located en route from the scene of the crime to his home.

The county officials likewise testified as to the free and voluntary character of the confession made to them on the 8th and 9th of March, 1948, which corresponded in all material particulars with that made to the city officials on the evening of March 8, 1948, except that in one of the confessions he said that he got the hammer at the home of a neighbor, whereas in the other he said that his brother had left it at his home before leaving to work in another section of the State. The deputy sheriff testified that he questioned this brother prior to the trial of the case and that he admitted that he had left two hammers at the defendant's home and that the handle of at least one of them was wrapped with tape. This brother denied having so identified his hammer, but this conflict in the evidence presented an issue of fact for the jury.

The defendant assigns for error on this appeal three grounds: First, that he was entitled to a directed verdict by the trial court in his favor, second, that the two confessions were inadmissible on the ground that they were not freely and voluntarily made, and third, that he should have been granted a new trial for the two foregoing reasons. He does not contend that the evidence was insufficient to sustain a conviction if the confessions were competent, but merely that he was entitled to a directed verdict because of their alleged incompetency and he con-

tends that he was entitled to a new trial for the same reason. Neither does he challenge the constitutionality of the method and procedure in our state courts whereby the voluntariness of a confession is determined, since he could not successfully do so. The method is that when the introduction of a confession is objected to by the defendant on the ground that it was not freely and voluntarily made, the trial judge has the jury to retire to its room while he determines as an issue of fact from the testimony of those who were present at the taking of such confession and also from the testimony offered by the defendant, whether or not the same was made freely and voluntarily.

 In the instant case, after a full hearing which covered almost half of the testimony taken throughout the entire trial, the trial judge held that the two confessions were made freely and voluntarily and he therefore permitted their introduction in evidence. Unless his decision in that behalf on such an issue of fact is manifestly wrong we think it is our duty to affirm his action under the well settled rule announced in an unbroken line of decisions of this court. No useful purpose can be served by an analysis of all of the testimony of the numerous witnesses who testified at the trial in support of the voluntariness of this confession, and it would unduly prolong this opinion to do so. As against the testimony of the numerous officers and disinterested private citizens, many of whom did not even know the deceased, we have the uncorroborated testimony of the defendant, who testified in a vacillating and contradictory manner before the trial judge in the absence of the jury as to whether he merely told the officers and other witnesses that he killed Mr. Dean or whether he actually killed him. He would say in his testimony first that he did not commit the crime but merely told the officers that he had done so, and then he would again state categorically when it was that he remorselessly finished beating his

victim to death on the highway. The record speaks for itself in the premises.

If the decision of a trial judge upon a preliminary inquiry into the voluntary character of a confession, and the subsequent finding of the jury in that behalf, where such decision of the judge and finding of the jury are made on conflicting evidence and are supported by the overwhelming weight thereof, are to no longer be of any force and effect, then an accused will only need to commit his crime while alone with his victim, make a free and voluntary disclosure of his guilt to the officers and others, and then make the *claim*, for the benefit of the record on appeal, that his confession was coerced. If the appellate courts in order to comply with due process of law must adopt the theory that they should accept the uncorroborated statement of a calloused criminal as being a "thus saith the Lord," and to thereupon overturn the decision of the triers of fact as to the voluntariness of a confession, then the decisions of such courts in that regard will have become inimical to the maintenance of law and order.

But it is urged that the defendant is entitled to have his confessions of guilt nullified by the courts for the reason that none of his friends or relatives, nor an attorney, were summoned to be present when the confession was made, and the decision in the case of Haley v. Ohio, supra, is relied upon as authority for such a contention. We are of the opinion that the facts in the case at bar are readily distinguishable from those in that case. In the Haley case the officers began questioning the accused around midnight and continued to do so until 5 o'clock A. M., when he confessed; he claimed to have been beaten and so testified; his mother claimed that his clothes were torn and bloody when she visited the jail to get them two days after his arrest and carried some clean clothes for his use; that she was not permitted to see him at that time; that when she first saw him five days after his arrest he was bruised and skinned; that

during that interval a lawyer retained by his mother tried twice to see the accused but was refused admission by the police; that he made the confession after having been shown (not merely informed of) the written confessions of the two other boys, jointly accused; and that at no time before making the confession was he advised of his right to counsel. No such conditions are shown to exist in the case at bar. The accused in the instant case was questioned in the early part of the evening for an hour at first with an hour or more intermission, and the questioning was largely with reference to two other crimes which he confessed and still others that were then unsolved, before he admitted the murder of Mr. Dean at about 9:30 of the same evening as hereinbefore shown. Moreover, he was advised of his right to have an attorney before the confession in question and answer form was made in the presence of the eleven witnesses at the police headquarters. A good portion of the remainder of the time before the confession was finally signed was consumed by the accused in showing the officers over the route he had traveled with his victim, and by the officer and the city editor in the typing of the question and answer confession which he had previously expressed the willingness to make.

██ But it is also urged that the defendant in the instant case was denied due process of law in violation of the federal Constitution, in that he was held incommunicado after the confession had been given, and that he was not taken before the proper officer without necessary delay for examination of his case. However, in the case of United States v. Mitchell, 322 U. S. 65, 64 S. Ct. 896, 898, 88 L. Ed. 1140, where the accused was held for eight days after his confession prior to arraignment before a committing magistrate, and where the court recognized that such an unreasonable detention was illegal, it was announced in the opinion of the court that "in any event, the illegality of Mitchell's detention does not retroactively change the circumstances under which he

made the disclosures. These, we have seen, were not elicited through illegality. Their admission, therefore, would not be use by the Government of the fruits of wrongdoing by its officers. Being relevant, they could be excluded only as a punitive measure against unrelated wrongdoing by the police. Our duty in shaping rules of evidence relates to the propriety of admitting evidence. This power is not to be used as an indirect mode of disciplining misconduct."

The foregoing announcement of the federal Supreme Court appears to us to be not only good law but plain common sense. The Justice who wrote the opinion in the Mitchell case, supra, wrote a separate opinion in Haley v. Ohio, supra, and we do not find therein an expression of any view contrary to that expressed by him in the Mitchell case as hereinbefore quoted. His controlling vote in the Haley case was predicated upon the facts and circumstances under which the confession was obtained, and he makes no reference in his separate opinion therein to what transpired thereafter. Indeed it would be difficult to conceive how a free and voluntary confession can retroactively be rendered involuntary by a failure on the part of the officers to thereafter take the prisoner before a magistrate without unnecessary delay for an examination in this case.

In the Mitchell case, supra, the learned justice, speaking for the court, said: "Inexcusable detention for the purpose of illegally extracting evidence from accused, and the successful extraction of such inculpatory statements by continuous questioning for many hours under psychological pressure, were the decisive features in the McNabb case which led us to rule that a conviction on such evidence could not stand. We are dealing with the admissibility of evidence in criminal trials in the federal courts. Review by this Court of state convictions presents a very different situation, confined as it is within very narrow limits. . . . Therefore, in cases coming from the state courts in matters of this sort, we are con-

cerned solely with determining whether a confession is the result of torture, physical or psychological, and not the offspring of reasoned choice." The Court had said in McNabb v. United States, 318 U. S. 332, 63 S. Ct. 608, 613, 87 L. Ed. 819, 824, that in considering due process under the Fourteenth Amendment, "the scope of our reviewing power of convictions brought here from the federal courts is not confined to ascertainment of Constitutional validity."

Thus it is that we understand it to be true that a majority of the members of the federal Supreme Court are committed to the view that detention without commitment is only one factor for consideration in reaching a conclusion as to whether or not a confession is free and voluntary; that it is only where the confession is obtained *as a result of* an unreasonable delay in taking a prisoner before a magistrate for an examination into his case, that his admissions of guilt under such psychological pressure are inadmissible. This is to be found from the opinion of the Court in a later case than that of Haley v. Ohio, because in Upshaw v. United States, 335 U. S. 410, 69 S. Ct. 170, 171, 93 L. Ed. —, the Court had under consideration Rule 5(a) of the Federal Rules of Criminal Procedure 18 U. S. C. A., which provides that "An officer making an arrest . . . shall take the arrested person without unnecessary delay before the nearest available" committing magistrate and when the arrested person appears before the magistrate "a complaint shall be filed forthwith"; and the court recognized that the holding in the Mitchell case, supra, "was only that Mitchell's subsequent illegal detention did not render inadmissible his prior confessions." And it was then noted that if a confession is obtained as a result of and during an illegal detention by failure promptly to carry a prisoner before a committing magistrate the same is inadmissible in evidence. But in the case at bar no confession was obtained as a result of an illegal detention. Here, there was no unnecessary delay, before the confession was ob-

tained, in taking the prisoner before a magistrate for inquiry into the case. In this state the magistrate and other courts are open only within legal hours, that is to say, in the daytime, and it was a reasonable exercise of the right of the officers, under Section 2473, Mississippi Code of 1942, requiring only that a person making an arrest shall take the defendant before an officer ''without unnecessary delay'' for examination of his case, when they questioned him on the evening of his arrest in regard to his connection with the commission of several major crimes.

No officer should make a complaint before a magistrate so as to charge a suspect with a capital or other felony, until such officer has had a sufficient opportunity to ascertain whether or not such a complaint is reasonably justified. The mere questioning of a likely suspect may reveal that he was not at the time complained of within the jurisdiction where the crime in question is said to have been committed, and his contention in that behalf may be checked and verified so that he may be released from custody without the necessity of his being charged before a magistrate with the commission of a heinous crime. A committing magistrate has no jurisdiction to inquire into his case until someone is willing to lodge a formal charge against the accused.

As to summoning a member of the suspect's family or a friend or lawyer when an arrest is made to attend the interrogation to be conducted by the officers, it is a matter of common knowledge among law enforcement officers that many crimes are committed by persons from other jurisdictions who are not only unwilling to give the names of the members of their family but often refuse to truthfully disclose their own names, and so far as having a lawyer present to advise such a suspect, we know of no authority whereby officers may commandeer the attendance of an attorney at such an interrogation. Moreover, in the instant case, the accused was arrested in the presence of his father and mother who knew that

he was being incarcerated, and there was no refusal to permit the attorneys of the prisoner to have access to him after they were employed in the case. And even though it may be true that the officers did not allow his mother to see him on each of her visits, whether due to the observance of visiting days or not, such action of the officers following the confessions could not have rendered involuntary the free and voluntary confessions previously made by him. This view is sustained by the Mitchell case and clearly recognized in the Upshaw case, hereinbefore cited, and we do not think any view to the contrary has been concurred in by the majority of the justices of the Supreme Court of the United States in any case. The public also is entitled to protection in the solicitude of the courts for the rights of an accused. Instead of the decision of the trial court and the finding of the jury in the instant case as to voluntariness of these confessions being manifestly wrong, we are of the opinion after a careful study of the entire record that such decision and finding were eminently correct and that the judgment and sentence of the trial court should be affirmed.

The date for the execution of the sentence of the defendant, Arthur Moore, is hereby fixed for Friday, July 22, 1949.

Affirmed and Friday, July 22, 1949, fixed as date of execution of sentence.