ROBERTS *v.* STATE.

In Banc. Feb. 12, 1951.

No. 37720 (50 So. (2d) 356)

Allan **T. Edwards**, **Forrest B. Jackson**, Claude **F. Pitt-man**, and **W. U. Corley**, for appellant.

**J. P. Coleman,** Attorney General, for appellee, replied to the point:

**Roberds, J.**

Appellant was convicted of the murder of his five year old granddaughter, Mary Louise Hill, and sentenced to death. He made a confession of the crime. That was introduced against him. His main contention on this appeal is the confession was not admissible as evidence. He says it was not competent as evidence, first because when he made it he was being illegally detained in jail and had not been charged with this crime, and, second, because the evidence aliunde the confession, is not sufficient to show that Mary Louise came to her death through a criminal agency rather than from natural or accidental causes. We will consider and decide these two main contentions in the order stated.

The confession was made October 29, 1949, and was in the form of questions by the officers and answers by Roberts, taken down by a stenographer at the time and transcribed and then read over to and signed by Roberts in the presence of Dr. W. Douglas Hudgins, Pastor of the First Baptist Church of Jackson, Miss.; J. D. Holden, chief of police; E. L. Browne, of the detective force; and S. B. Barnes, of the police force of Jackson, all of whom signed their names as witnesses to the confession. This is the confession:

"I, Houston Roberts, make the following statement to Detectives Browne and Barnes of the Jackson Police Department relative to poisoning my little grandaughter, Mary Louise Hill, age 5, by giving her poison in capsules on or about June 26th., 1949 and she passed away at the Baptist Hospital on July 16, 1949. I make this statement of my own free will and accord without any

threats or promises being made to me to cause me to make such statement.

"Q. Mr. Roberts you are charged with the murder of your little granddaughter, Mary Louise Hill, age 5 by putting poison in some capsules and giving her some of them, this taking place on or about June 26, 1949, and she passed away at the Baptist Hospital on July 16, 1949. Mr. Roberts are you guilty of this crime, and if so will you tell us about it? A. Yes sir I did this and I will tell you all about it.

"One day during the week of June 19, 1949, Mrs. Ruby Pace came to my home at 641 S. Gallatin Street and brought a white pill box containing twelve Phenobarbatol tablets and in this box she also had some powder from poison that I think was arsenic of lead. We then went in my room and closed the door, and cleaned out one end of the twelve capsules and put the poison in the end we had cleaned out, and left the Phenobarbatol in the other end of the capsule and then put the capsules back together. We then put them in the dresser drawer. Mrs. Pace stayed around there for a while and then went back home. Then the following Sunday, which was June 26, 1949, I gave Mary Louise Hill four of the poison capsules. Then on July 5, 1949, the day before she was carried to the hospital I gave her the other eight capsules containing poison. At the time I gave her the eight capsules she went to sleep and the next morning we carried her to the Baptist Hospital and she stayed there until she passed away on July 16, 1949.

"Q. Mr. Roberts did Mary Louise tell her mother that you gave her a pill? A. Yes.

"Q. Mr. Roberts where were you when you gave Mary Louise the first capsule? A. I was in the kitchen.

"Q. Did your daughter, Mrs. Gladys Hill ask you at the time if you gave Mary Louise a pill? A. Yes sir she did and I told her no.

"Q. Mr. Roberts, do you have any idea where Mrs. Pace got this poison? A. Not unless she bought it at Gates Drug Store on N. Farish Street.

"Q. Where did Mrs. Pace get the phenabarbatol tablets that she had the poison in the box with? A. At Gates Drug Store on Farish Street.

"Q. Who was at the hospital at the time Mary Louise Hill passed away? A. I was.

"Q. Did you call your daughter and tell her about Mary Louise Hill's death? A. Yes sir.

"Q. Did the nurse or doctor suggest to you anything about performing an autopsy on Mary Louise after she died, to determine what caused her death? A. The nurse asked me if I wanted an autopsy performed and I told her we did not want one performed.

"Q. Mr. Roberts how much insurance did you have on Mary Louise Hill? A. We had eight hundred and eighty dollars.

"Q. Who was this insurance payable to? A. Mrs. Gladys Hill, my daughter.

"Q. How much money was collected on this policy? A. Six hundred and thirty dollars.

"Q. Was this money paid in cash or checks? A. In checks.

"Q. Who got the checks cashed? A. I did.

"Q. Who got the six hundred and thirty dollars? A. I got the six hundred dollars and my daughter, Mrs. Hill, got the balance.

"Q. What did you do with this six hundred dollars? A. Ruby Pace got one hundred and fifty dollars of it and I paid bills with the rest.

"Q. Mr. Roberts have you told us the truth about this case? A. Yes sir.

"Q. Can you read and write? A. I can't read but I can write my name.

"Q. Mr. Roberts after this statement is read to you and you find it to be just as you told it to us and the way

it happened, will you sign it as being true and correct?
A. Yes, sir.

Signed Houston Roberts

(11:42 A. M.)
Witnesses: s/W. Douglas Hudgins
s/J. D. Holden
s/E. L. Browne
s/S. B. Barnes''

We will relate the circumstances leading up to and existing at the time the confession was made and then set out the applicable law. These are the circumstances:

Appellant was residing with his daughter, Mrs. Hill, then divorced from her husband, at 641 S. Gallatin St., in Jackson, Mississippi. They were there operating a rooming and boarding house. Mrs. Hill had two little girls—Mary Louise, born July 10, 1944, and Shirley Ann, born October 23, 1945. They were, of course, granddaughters of appellant. Mary Louise died July 16, 1949, and the body was interred in Hopewell Cemetery in Jeff Davis County, Mississippi. Roberts and Mrs. Hill continued to reside at 641 S. Gallatin Street. Shirley Ann became ill in October 1949, and was carried to St. Dominics Hospital in Jackson. To this time it is not shown that any suspicion rested upon appellant bringing about the death of Mary Louise. However, on October 18th, 1949, after Shirley Ann had been carried to the hospital, the officers received information which brought them to the conclusion that appellant had attempted to poison Shirley Ann. On October 21, 1949, officers Barnes and Browne and Dr. Riley, County Health Officer, went to the home of Roberts and asked some questions about the cause of illness of Shirley Ann. He denied any knowledge of the cause. The officers informed him they had information connecting him with that illness and they were taking him to the city hall for investigation. They placed him in jail and questioned him some four times about Shirley Ann. To that time no charge of a crime had been made against him. However, on October

25th affidavit was made and filed charging him with attempting to murder Shirley Ann by administering poison to her. No questions were asked Roberts about the matter the next day, October 26th, but he was again questioned on October 27th. On that day he confessed he had attempted to murder Shirley Ann by the administration of poison. Before that was done Roberts had sent for and had been visited in jail by two prominent lawyers of Jackson. No questions were asked him on October 28th, and to this time he had not been questioned about the death of Mary Louise. However, on the morning of October 29th, the officers notified Roberts that the body of Mary Louise was going to be exhumed and a medical examination made of her internal organs in an effort to determine whether she also had been poisoned. This interview did not last over thirty minutes. When he was informed of the action which was going to be taken to determine the cause of the death of Mary Louise he gave the confession quoted above. Now, it should be stated that there is no evidence whatever that he was induced to make this confession by any hope of reward or fear of punishment. On the other hand, the testimony is undisputed he was informed he could either make it or not as he wished, but that if he did do so it would be used against him. Also, that Dr. Hudgins was called by the officers as a precaution against any intimation that Roberts did not know of the contents of the confession or that he was improperly induced to make it. Dr. Hudgins testified that he asked Roberts if there had been any threat towards or inducement held out to him to make the confession and Roberts said there had not been and that he was making it freely. Dr. Hudgins read it to him carefully and Roberts said he understood it. It was then signed by him and the witnesses. Thus it is seen that the assumption of appellant that he made his confession in this case while being illegally detained is not correct. He was then legally detained under an affidavit charging him with the attempted murder of

Shirley Ann. Also, it will be noted that, under the proof here, his detention was not a factor in producing the confession. He confessed because he thought his crime had been, or would shortly be, detected by an examination of the internal organs of his victim. He was haunted by the approaching shadow of his crime.

But had the assumption been correct—that is, that accused was under arrest without a charge having been made against him—that fact alone would not render the confession inadmissible in this State. That exact question was decided by this Court November 6, 1950, against the contention of appellant in the case of Winston v. State, Miss., 48 So. (2d) 513. That case refers to and quotes from Quan v. State, 185 Miss. 513, 188 So. 568, 569, and Moore v. State, 207 Miss. 140, 41 So. (2d) 368, so holding. It also discusses cases which have been decided by the Supreme Court of the United States involving this question, and concludes that that court has not held to the contrary. So, as far as Mississippi is concerned, the question is settled. The contention of appellant in this respect is not well taken. The confession was competent evidence.

But appellant says the confession was not competent because the proof aliunde the confession is not sufficient to show that the death of Mary Louise was brought about through a criminal agency rather than by natural causes. The rule in this State in such cases is, "In order for the corpus delicti to be established by evidence aliunde the confessions, it is not necessary that the proof aliunde should show the crime or corpus delicti beyond a reasonable doubt, but it is sufficient to show it by a preponderance of the evidence or by evidence amounting to a probability, and then the confessions will be received, and, if the confessions coupled with the proof of the corpus delicti aliunde show the corpus delicti beyond a reasonable doubt, it is sufficient." Simmons et al. v. State, 208 Miss. 523, 44 So. (2d) 857, 858. Aside from the confession, is the proof in this case sufficient to

establish the probability a crime had been committed?
This is the evidence on that question:

The chain of events started June 26, 1949. On that
day Mary Louise became rather violently ill at her home
on Gallatin Street. Roberts carried her to the Baptist
Hospital about 7 P. M. He said she had been drowsy
all afternoon; that he could not wake her up. Dr.
Garrison saw her and testified she was drowsy, lethargic,
her pupils were dilated and her reflexes sluggish. He
asked Roberts if the child had taken any pills of any
kind and he said she had not. Therefore, all the doctor
did was to thoroughly wash out her stomach. She then
appeared much better; was able to walk about, and after
remaining in the hospital about two hours, was carried
back home by Roberts. No chemical, or other tests, to
determine the trouble, were made in view of Roberts'
statement she had not taken anything.

In July 1949 Mrs. Pauline Hutchins and her daughter
had rooms at the rooming house on Gallatin Street
operated by Roberts and his daughter, Mrs. Hill. She
testified that on Sunday, before the child was carried
back to the Baptist Hospital, that Mary Louise went
to sleep in the afternoon and had not waked up at seven
o'clock the next morning. Witness had worked during
that night and when she got back to the rooming house
the next morning Roberts met her at the door and
said he did not think Mary Louise "is going to be with
us much longer"; said he didn't have any hope for her;
that she was not going to live much longer. Roberts
told her that "many, many times". The child was yet
sound asleep.

Roberts and Mrs. Hill then carried her back to the
Baptist Hospital. That was July 6th. Her condition
was similar to that when brought to the hospital June
26th but much more serious. Dr. Garrison again in-
quired both of Roberts and the mother whether it was
possible the child might have taken something and was
assured she had not. The child began to have con-

vulsions. The mother and Roberts said she was subject to convulsions when she was younger. These convulsions at the hospital lasted from a few moments to two hours. The child was unconscious and unable to take nourishment through the mouth. After the first two days she had two or three convulsions each day. The nurse testified they were very violent. She said "They were hard convulsions, and we had to hold her". They involved her entire body, arms, mouth and legs. She vomited much. Five doctors were called in for examination of the child and consultation. Finally, Dr. Neal, a brain specialist, made two small holes through the skull, and an X-ray of the brain. Apparently the X-ray did not show any physical deformity of the brain. The child died in the midst of a violent convulsion on the morning of July 16th. Dr. Garrison, in his certificate, gave it as his then opinion that the cause of death was acute encephalitis. He explained this was an inflammation of the brain which might be brought about by taking nonpoisonous or poisonous substances, as, in the first case, overdoses of barbiturates, and, in the second case, lead, or arsenic, poison; that in nonpoisonous cases the condition might be acute, as he first certified in this case, but in poisonous cases it would be "infectious", as he later stated in his modified certificate; that the physical appearance, and the resulting actions of the patient, might be the same in both poisonous and nonpoisonous cases. Therefore, having been assured this child had taken nothing which could produce the result, yet seeing its actions, he had simply certified the cause of the death as acute encephalitis. But he said had he known the child had been given an overdose of bariturates, as well as lead poison, as afterwards developed, he would have certified the cause of the death as "infectious" encephalitis, as he did do later after such knowledge came to him.

When Mary Louise died, the nurse, acting under instructions of Dr. Garrison, asked Roberts if he would

consent to an autopsy of the body, and Roberts said he would not. Roberts seemed to be in charge and no request was made of the mother. Some of the witnesses also testified Roberts seemed rather indifferent as to whether or not Mary Louise got well.

About the time Mary Louise was carried to the hospital in June, appellant went to see the agent of an insurance company, which company had a policy on Mary Louise, and told the agent she was ill and he did not think she would get well. Also during the time she was at the hospital the second time he saw this agent and told him, more than once, "I think she is going to die"; that she had no chance of recovery. On the day Mary Louise died, and, of course, before her burial, Roberts called the agent at his office, and the agent not being there, he called the agent at his home, and was told the agent was attending a sales meeting. Roberts was at that meeting when it adjourned, and he wanted the insurance company to pay him the insurance money immediately. The policy was payable to Mrs. Hill, the mother of the insured, and Roberts was told she would have to sign the papers and endorse the check. Roberts talked about getting a lawyer. That was Saturday. Roberts and Mrs. Hill came to his office the next Monday morning, but the matter was not then closed, and they came again Wednesday. Roberts got the papers filled out by the doctor. The check was made out to Mrs. Hill but she endorsed it and gave it to Roberts, and he left in a hurry "walking pretty rapidly towards town".

Also Roberts, in January 1949 had taken out a life insurance policy on Mary Louise in the face value of $500.00. During the last illness of Mary Louise and after her death Roberts had discussed the matter with the agent of the insurance company. Roberts had paid the premiums on the policy. He was paid $400.00, because it was a graded policy from one to six years, and the face value of $500.00 did not become due until the

insured became six years of age. Roberts was very much dissatisfied that he was not paid $500.00.

After collecting the insurance upon Mary Louise appellant was busy about the insurance upon the life of Shirley Ann. He had a policy of $500 on her life. He saw the agent a number of times and wanted that increased to $2,000.00. The agent did not desire to write a policy for that amount, reasoning that the premium on this, together with the premium on a group policy appellant had, would be greater than appellant could pay. The policy was finally increased to $1,000.00 about the first of August, before Shirley Ann became ill in October.

Mary Louise was laid to rest in Hopewell Cemetery. After the developments above related with reference to Shirley Ann the authorities concluded there should be an autopsy of the body of Mary Louise; consequently, on October 29, 1949, upon petition of the district attorney of Hinds County, the circuit judge of Jeff Davis County entered an order for the disinterment of the body of Mary Louise and an examination of her remains for the detection of poison in her body. This was done. The body was brought to Dr. F. G. Bratley of Jackson, Mississippi, a specialist in autopsy work. He removed the stomach, portions of the liver, and kidneys, two feet of the intestines; some hair, finger and toe nails. These were properly prepared and sent to the State Chemist at State College, Starkville, Mississippi. Dr. Few, of the above college, an expert in such matters, with much experience over many years in making such examinations of human and animal bodies, placed all of the parts in one container, applied thereto the appropriate chemicals and reduced the entire mass to a liquid; then he divided the liquid in half and examined one half for signs of arsenic poison and the other half for signs of lead poison. He found "lead chromate". He found no traces of arsenic poison. He said, "There was a small amount of lead present". He figured less than a gram. However, he

explained he had examined only one half of the mass for lead; that had he examined all of it for lead, he naturally would have found twice as much lead poison as he did find. Also, it was explained by this witness, and others learned in the science of medicine and chemistry, that lead poison tends to leave the stomach, kidneys, liver, etc., during the life time of the victim, and finally lodge in the bones of the body, whereas arsenic tends to remain in the kidneys, liver, etc. No bone structure was included in the mass examined by Dr. Few. Naturally, had there been sufficient bone structure therein, the quantity of lead poison found through the analysis would have been greater. Too, as bearing upon the quantity of poison found, it is well to remember that the body had been interred since July 17, with whatever resulting effect that fact might have had upon the quantity of poison that could be detected in the mass examined. The important fact is that lead poison was found within the body of this child.

Mr. G. C. Gates testified that in 1949 he operated a drug store on Farish Street in the City of Jackson. He said he knew Mrs. Ruby Pace, mentioned in the confession, and also the appellant. He knew appellant as Mr. Pace. That was because he and Mrs. Pace had been in the drug store together. He addressed appellant as Mr. Pace, who did not correct him. He said that in January 1949 he had sold to Mrs. Pace, on a prescription, 24 capsules, each containing 1½ grains of sodium seconal, a derivative of, but considerably stronger than, phenobarbital. He said he had refilled that prescription five or six times for the appellant, charging them to Mr. Pace, and that appellant had paid the bills. It is not clear whether each refill was for twenty-four capsules or some of them were for twelve capsules. The last time appellant got these capsules was July 1, 1949. Gates also testified that sometime during the summer of 1949 appellant tried to purchase at his drug store some strychnine or sulphur, but he would not sell it to him.

██ █ Without further detailing the testimony, and without lengthening this opinion by summarizing what we have already related, we think it evident the finding in the lower court that the death of Mary Louise Hill was probably the result of a criminal agency was justified and should be sustained.

Appellant next says the evidence obtained from the exhumation of the body was not competent. He cites no case holding that but seems to base his contention on two grounds—first, that appellant was not made a party to and was not given notice of the petition of the district attorney for an order of the court for that purpose, and, second, on the general proposition that there is no statute authorizing this to be done. ██ █ As to the first proposition, appellant was not a parent of the child, and, therefore, was not entitled to any notice of such proceeding, if, for the sake of the contention, it be admitted a parent is entitled to notice in such a proceeding, which we do not hold. In the second place, it is not shown appellant was the owner of the plot of ground in which rested the remains of Mary Louise. Therefore, no reason is perceived why appellant should have been made a party to the proceedings. On the second ground, it is true there is no statute in Mississippi specifically authorizing this proceeding. However, we judicially know resort has been had to such proceedings throughout the history of the State. ██ █ In addition, the right of the State to do so in proper cases is well grounded in the jurisprudence of this country. The rule is stated in 15 Am. Jur., p. 841-842, Sections 18 and 19, in this language:

"In a proper case, a body may be disinterred solely for the purpose of changing the place of burial or for the purposes essential in the administration of justice. . . .

"The right of relatives of a deceased person to have his corpse remain undisturbed after burial must yield to the public interests, and in a prosecution for homicide, the exhumation of the victim's remains may be ordered

on the application of the state or of the defendant when it appears to be absolutely essential to the administration of justice. Thus, where the question of the guilt or innocence of the accused cannot be determined except by exhumation and autopsy of the body of the deceased, the court may and should order disinterment even against the will of his relatives. . . .

"The rule has been recognized that where the interests of justice demand it and where there is no other way to prove a fact except by the exhumation of a body which has been interred, the court may make an order for the disinterment of the body and an examination thereof, even in civil cases." See Grangers Life Ins. Co. v. Brown, 57 Miss. 308.

Again, it is said in 15 Am. Jur., page 849, Section 28: "Autopsies are sometimes essential to the protection of health and the discovery of crime. In such a case, the welfare of society demands that the state or its authorized representative be permitted to conduct an examination by dissection if necessary without reference to the wishes of the relatives of the dead. Hence, a coroner has the right to perform an autopsy or have one performed where reason therefor exists, . . . ."

Appellant intimates the action here taken may be in violation of Sections 2076 and 2078, Miss. Code 1942. These sections have no application to this situation. They have reference to wanton and criminal disturbance of interred bodies, or graves, for the purpose of stealing therefrom, and for private gain or purposes. There is no merit in the contention under consideration.

It is argued the venue of the crime was not shown. The testimony shows the acts occurred at 641 S. Gallatin Street, in the city of Jackson, Miss., and other testimony discloses that that location is in the First Judicial District of Hinds County, Miss.

Appellant complains of the granting to the State of instructions 3 and 4. Instruction No. 3 has been given and approved time and time again. Instruction No. 4

deals with insanity. █ It told the jury that for insanity to be a defense to a crime the insanity must be of such nature and extent as that defendant did not know right from wrong as applied to the crime charged. That is the law in this state. In addition, defendant obtained twenty-two instructions covering every phase of his defense and all the rules of law applicable thereto. There was no error in the granting of these two instructions.

Lastly, appellant says the proof shows he was insane to such extent that he could not be adjudged guilty of this crime. The substance of the proof on behalf of appellant on that question is this:

Dr. N. B. Bond, a consulting psychologist, said he interviewed Roberts in jail December 1, 1949, a few days before the trial. That was the first time he had seen Roberts. He applied certain standard intellectual tests to him; that as a result he thought Roberts had the learning ability of the average person of ten years and eleven months old. He was frank to say this had reference to the power of the mind to learn, its "ability to store up knowledge", and that one of that mental level had the ability to acquire "a great deal of knowledge". He said that ability to learn did not include what the person had already learned; that it had reference to the strength of mind—not to the "acquired knowledge". But, as a practical proposition, all of the tests and theories which were applied, amounted to little, for the reason that at the last the district attorney asked the witness this question, "In your opinion, he knows right from wrong as good as I do?", and Dr. Bond replied, "That is right."

Dr. F. L. Summers of Hattiesburg testified. He saw Roberts the first time October 13, 1933, in a hospital at Hattiesburg. Roberts was having convulsions. The doctor thought he "had some trouble, probably syphylitic paresis or encephalitis". He saw Roberts a year or two later and made a Wasserman test, with a positive showing. He treated the patient about a month. He thought his treatment removed all infection from the blood, but

was not sure. The doctor was refreshing. He said he was not a specialist in anything; that he was just a "more or less good old family doctor". He saw Roberts last in 1935. He thought then he had cured him of his venereal trouble. He had not seen Roberts for fourteen years before he testified.

Mrs. Estelle Roberts is a niece of appellant. Her husband is not related to appellant. She lives at Mt. Olive, Miss. At some time before she married in 1938 she resided in the same house with appellant. She said at one time Roberts had epileptic fits. She had not been around him in recent years. She said Roberts communicated with her after Mary Louise was taken to the hospital and she came to Jackson on Thursday and helped nurse the child. She said Roberts was attentive to and concerned about her.

Defendant introduced a petition for lunacy which had been filed by Mrs. John Roberts in the chancery court of Forrest County in January 1940, and a verdict of a jury to the effect that Roberts was not able to care for himself, and an order of said chancery court, dated January 30, 1940, that he be confined in the asylum. That was the testimony of defendant on the sanity issue.

The state offered proof in rebuttal. It introduced Dr. W. L. Jaquith. He was the Director of the Mississippi State Hospital at Whitfield. He testified from the records of the hospital. He said Roberts was brought to the hospital in January 1940; that he was then charged with a criminal offense in Forrest County. The entire medical staff of the Hospital observed and studied Roberts. The diagnosis was "without psychosis, malingerer". The doctor said "All of the staff agreed this man is without psychosis". They all agreed he was trying to "fake insanity"; that, as stated, he was "shamming". The word "malingerer" means he was faking insanity. He remained at the institution thirteen days and was sent home.

■■ As bearing upon his mental responsibility, it is proper to weigh and consider the answers he made to the questions put to him when he made his confession. No doubt the jury did that, and were impressed by the intelligence evidenced by such answers.

Also, of importance on this question are his actions in making his purchases at Gates' Drug Store, paying the bills, etc., and especially his conversations with the various insurance agents and in his scheming to obtain payment to himself of the insurance and his efforts, and success to some extent, in negotiating for increased life insurance upon his two grandchildren.

All in all, his guilt or his innocence, his sanity or insanity, his knowledge or lack of knowledge that he was doing wrong in administering these deadly drugs to this helpless child, were questions for the jury. They decided against him. He had a fair trial; he was ably represented. His case illustrates in a very pointed and practical manner the truth that "the wages of sin is death".

Affirmed.