Lewis *v.* State.

No. 39305 November 8, 1954 75 So. 2d 448

*William H. Stewart,* Poplarville, for appellant.

*Joe T. Patterson,* Asst. Atty. Gen., Jackson, for appellee.

GILLESPIE, J.

Mack C. Lewis, the appellant, was indicted for the murder of Kenneth L. Mason, tried, convicted, and sentenced to death.

Lewis was a private in the United States Army, stationed at Fort Bliss, near El Paso, Texas. He left Fort Bliss March 31, 1953 on furlough to go to his sister's home in Buffalo, New York. On April 2, he had reached New Orleans, Louisiana, after receiving several rides. He was hitchhiking his way to Buffalo, and was carrying a .25 calibre pistol. On the morning of April 2, he was on the outskirts of New Orleans for the purpose of catching a ride. On the same day, Kenneth L. Mason, a resident of New Orleans, left that city about 11:50 A.M. to meet his brother and business associate at Biloxi, Mississippi. Mason saw Lewis thumbing for a ride and picked him up, telling Lewis that he would take him as far as Biloxi. About thirty minutes later, as Mason was traveling east on U. S. Highway 90 and after they had entered Hancock County, Mississippi, Lewis pulled the gun from his pocket and told Mason to turn off on a dirt road to the left of Highway 90. Mason turned off the

highway and drove about a quarter of a mile into the swamp where Lewis and Mason got out of the car. Lewis kept the gun pointed at Mason and told him to walk across the field. When they were about 100 yards from the dirt road, and while Mason stood facing Lewis, Mason was required to throw his wallet to Lewis. Lewis put the wallet into his pocket and after looking at Mason a few seconds, decided that he would kill him. He shot Mason in the body; Mason grabbed his stomach and asked Lewis why he did it; then Lewis shot four more times; two of the shots took effect, one in the chest and one in the head. Mason was then on the ground, and made no more sounds. Lewis ran to his car, turned around, and headed back to Highway 90, and met two wood pulp trucks driven by negroes.

Lewis then drove east in Mason's 1951 Cadillac automobile until he reached Mobile where he went to a movie, after which he picked up a girl, had some drinks, and slept with the girl. From Mobile he went to Montgomery, Atlanta, and Savannah, Georgia, where he pawned his gun. On April 5, Lewis was arrested for speeding near Petersburg, Virginia; and at the time of his arrest he had on him the driver's license of Kenneth L. Mason, was driving Mason's 1951 Cadillac automobile, in which was Mason's golf clubs, brief case, and bowling ball, each of which was later duly identified.

When Mason's brother at Biloxi became alarmed because the April 2 engagement had not been kept, he notified the authorities. The Mississippi and Louisiana authorities were alerted; and, when the Virginia authorities notified Louisiana authorities that Lewis was being held in possession of the automobile, officers Casanova and Dupre of the New Orleans Police Department were sent to Virginia. These officers arrived in Virginia on the morning of April 8, and promptly interviewed Lewis, who told the officers that a man named Bobbie had given him the Cadillac car, a set of keys and the driver's license in New Orleans, with instructions to return it to

El Paso, Texas, after Lewis had used it to visit his wife. Lewis signed waiver of extradition to Louisiana; Casanova and Dupre telephoned the Louisiana authorities and secured an auto theft warrant for Lewis, and left Virginia to take Mason's car and Lewis to New Orleans. They were returning Lewis to Louisiana on the auto theft charge. On the trip from Virginia, which required about two days, Lewis was placed in local jails each of two nights. Casanova and Dupre did not question Lewis about Mason's murder on this trip. They were waiting until they were back in Louisiana to continue the investigation of the disappearance of Kenneth L. Mason. At that time they did not know that he was dead. When they had gotten back as far as the Mississippi Coast on the afternoon of April 10, Lewis asked Dupre what was his name. Dupre told him and inquired as to why he had asked, and Lewis replied: "You gentlemen have treated me very nice and I'm going to save you a lot of trouble. I killed Mr. Mason." Lewis then directed the officers to the road he had required Mason to take in leaving Highway 90 on April 2, and the body of Kenneth L. Mason was found at about 7:00 P.M., April 10, 1953. The body was found where Lewis said he shot him.

The Louisiana authorities kept the custody of Lewis until about 9:30 P.M., April 10, 1953, when he was released to the custody of Sheriff Egloff of Hancock County, Mississippi, the county in which the murder took place. Sheriff Egloff called the district attorney, who promptly responded and typed out a written confession as given by Lewis. The confession was signed before six people and was concluded about 11 P.M. on April 10, 1953. Lewis was not taken before a magistrate until sometime later.

The body of Mason was duly identified. Mason was wearing, at the time of his murder, a sport coat, a watch, a club pin, glasses, and a college ring, each of which was properly identified. The pistol used by Lewis

to commit the murder was secured and a test bullet fired therefrom. Upon comparison by a firearms expert, the test bullet and one of the bullets taken from the body of the deceased were found to have been fired from the same gun.

Without detailing the evidence further, it is here noted that the guilt of Lewis is manifest.

Lewis' sole defense was insanity. The defendant's proof on this issue consisted of the testimony of one half-sister and one full sister of Lewis. The half-sister testified that his mother died when he was a baby; that witness had not seen Lewis for some years when, in 1945, he came to live with her at Marion City, California; that Lewis lived with witness and her husband for about three years, when he left to live with his sister in Buffalo, New York, and witness had not seen Lewis for about six years; that while he lived with witness, he was "kind of mopey and simple acting," and would not go out and play like other children, but would sit around and mope; that he had some trouble with his school work; that his grandfather was off mentally, but had never been committed to an institution and lived in California where he shared an apartment with another man; that a first cousin of Lewis had fits and spells and committed suicide; that Lewis had two other cousins who were mentally deficient, one having been committed to an asylum, but the degree of kinship of these cousins was not shown; that Lewis was one of six children and his brothers and sisters were normal. Lewis' full sister, with whom he had lived from 1948 until he entered the army about two years later, lives in Buffalo, New York. She testified that Lewis, who was born in 1934, sometimes seemed like he was in a daze in that he day-dreamed, but did not day-dream like other people, and would sometimes not seem to hear when spoken to; that Lewis seemed like he was sort of silly at times. Neither

of these witnesses testified that Lewis did not know right from wrong. His full sister testified that he always knew right from wrong.

On rebuttal the State offered the sheriff and deputy sheriff in whose custody Lewis was kept while awaiting trial, a period of about five months. These witnesses saw Lewis every day, and one of them several times every day, and both testified that they observed nothing abnormal. A psychiatrist employed by the United States Veterans Administration Mental Hospital at Gulfport, Mississippi, made two examinations of Lewis while he was awaiting trial. He found no evidence of insanity.

The jury found the defendant sane. This finding was in full accord with the weight of the testimony, and no issue is raised on this appeal as to such finding of fact.

The appellant's first assignment of error is the complaint that the lower court erred in giving the State the following Instruction: ''The court charges the jury for the State that mere queerness or unusual conduct is not alone any defense to crime, unless the mind of the party committing the crime, if any, is so affected, at the time of the commission thereof, that the power to distinguish between moral right and wrong is destroyed; and even if one be abnormal or queer, still, if he be able to appreciate the difference between moral right and wrong as to the particular act, if any, then the law holds him responsible for that act regardless of such above abnormality or queerness, if any.''

Appellant relies on the case of Winchester v. State, 163 Miss. 462, 142 So. 454. The instruction in that case was as follows: ''Further it is not every form of insanity that the law recognizes as a defense to crime, and if one be insane but still be able to appreciate the difference between moral right and wrong as to a particular act, the law holds him responsible for that act regardless of how insane he may be.''

In the Winchester case, the last part of the instruction told the jury that the defendant was to be held responsible for the act "regardless of how insane he may be." It is not difficult to see that the quoted part of that instruction is in conflict with the first part, and that it would confuse the jury. Moreover, there were other grounds for reversing the Winchester case. In the case before us, the instruction complained of told the jury that if the defendant was able to distinguish between moral right and wrong, "then the law holds him responsible for that act regardless of such abnormality or queerness, if any." The State had the right to have the jury instructed that mere abnormality or queerness is no defense to crime. There was no error in granting the instruction. The same instruction was approved by this Court in the case of Williams v. State, 185 Miss. 449, 188 So. 316.

The only remaining assignment of error is the contention that it was error to admit the defendant's confession because the defendant was not informed of the charge against him, was under unlawful arrest, and was coerced into making the confession. This assignment also embraces appellant's argument that the confession was inadmissible because he was not taken before a magistrate and there informed of the charge against him prior to the signing of the confession.

██ ██ There is no merit in the contention that the defendant was not informed of the charge against him. Lewis took the stand in the absence of the jury on the hearing before the judge on the matter of the admissibility of the confession and he admitted he was fully informed that the confession would be used against him in the courts; that it was the district attorney who was taking the confession; and that the officers carefully indicated to him that it was a very serious crime with which he was charged. When a confession is free and

voluntarily made while under arrest, it is admissible, even though accused is not warned it may be used against him. C. F. Clark v. State, 209 Miss. 586, 48 So. 2d 127.

Nor is there merit in the contention that Lewis was under an unlawful arrest. Lewis was arrested in Virginia for speeding. He was in possession of Mason's automobile, driver's license, and other personal property. The Louisiana authorities were notified of these facts, and they knew Mason and his automobile were missing. The New Orleans policemen went to Virginia, and upon arrival, Lewis told them the car had been loaned to him in New Orleans. Under these circumstances, there was probable cause that Lewis had stolen Mason's automobile in New Orleans. It became the obvious duty of the New Orleans policemen to return Lewis to New Orleans for the automobile theft. They promptly telephoned the Louisiana authorities and an auto theft warrant was issued. Lewis waived extradition to Louisiana. When passing through Mississippi, Lewis voluntarily confessed the crime and showed the officers where he had killed Mason and the body was found. Without undue delay the New Orleans policemen delivered the custody of Lewis to the Hancock County, Mississippi, sheriff. The Louisiana authorities had custody of Lewis under lawful arrest for the theft of Mason's automobile. When Lewis confessed to the greater crime of murder while passing through Mississippi, it was the duty of the Louisiana officers to deliver custody to Mississippi authorities. This they did; and it was proper; and there is no lawful ground for complaint. Lewis was at all times under lawful arrest.

Appellant does not seriously argue that he was coerced into making the confession. Lewis testified that he was questioned continuously for about two days on the trip from Virginia; that he was promised that it would go light with him if he confessed; and he was scared. The policemen denied they told Lewis it would go light with him if he confessed; and denied they questioned him

about the murder on the trip from Virginia. The officers stated that they were waiting until they got back to their own jurisdiction to continue the investigation. Their primary duty at the time was to get Lewis to Louisiana on the theft charge. At any rate, there was a conflict as to whether Lewis was questioned on the return trip from Virginia. These facts were resolved against Lewis' contention in the lower court, and the lower court was not manifestly wrong. Unless the trial court's decision that the confession was voluntarily made and therefore could be introduced in evidence was manifestly wrong, the Supreme Court will affirm the action. Moore v. State, 207 Miss. 140, 41 So. 2d 368, appeal dismissed and certiorari denied, 338 U. S. 844, 70 S. Ct. 93, 94 L. Ed. 516; Clark v. State, 209 Miss. 586, 48 So. 2d 127.

 Lewis admitted on the stand during the hearing on the admissibility of the confession that the officers treated him ''nice'' on the trip from Virginia; that no one had threatened him; that no one had mistreated him; that he voluntarily told the officers he had killed Mason because they had been nice to him; that no one forced him to locate Mason's body; that no one mistreated him the night the statement was taken. In fact, Lewis testified that he had received nothing but fair treatment from the time he left Virginia with Officers Casanova and Dupre until he testified during the trial. There is no merit in the contention that Lewis was coerced into making the confession.

Finally it is contended that the confession should not have been admitted because Lewis was not taken before a magistrate and there informed of the charge against him before signing the confession. The only case relied on by appellant is McNabb v. United States, 63 S. Ct. 608, 318 U. S. 332, and that case is not applicable. The McNabb case was discussed in the later case of United States v. Mitchell, 322 U. S. 65, 64 S. Ct. 896, 88 L. Ed. 1140, wherein the Court said:

"Inexcusable detention for the purpose of illegally extracting evidence from accused, and the successful extraction of such inculpatory statements by continuous questioning for many hours under psychological pressure, were the decisive features in the McNabb case which led us to rule that a conviction on such evidence could not stand. We are dealing with the admissibility of evidence in criminal trials in the federal courts. Review by this Court of state convictions presents a very different situation, confined as it is within very narrow limits . . . . Therefore, in cases coming from the state courts in matters of this sort, we are concerned solely with determining whether a confession is the result of torture, physical or psychological, and not the offspring of reasoned choice."

In the Mitchell case the unreasonable and illegal detention after the confession was made was held not to have retroactively changed the circumstances under which the confession was made. It was also held in that case that the subsequent illegal detention of the defendant after the confession was made would not constitute use by the government of the fruits of the wrongdoing by its officers. In short, that case laid down the rule that if the confession was not illegally obtained the subsequent illegal detention would not retroactively make the confession inadmissible.

Lewis, in the case now before this Court, spontaneously made an oral confession to the Louisiana officers; and it was free and voluntary. This happened about 3:45 P.M. on April 10, 1953. Lewis also voluntarily offered to help the officers locate Mason's body. Up to this time Lewis could not have been taken before a magistrate because he had not yet gotten to Louisiana where he was being carried to face auto theft charges. The Louisiana officers could not have taken him before a magistrate at the place where Lewis made his oral confession of the murder. That place was in Harrison County, Mississippi, and actually no crime had

been committed in that county. It was obviously necessary for the officers to establish the venue of the murder that Lewis had confessed. Hancock County, Mississippi, lies west of Harrison County, where the confession was made, and the State of Louisiana is the western boundary. The body of Mason would have to be found before anyone knew what county and state had jurisdiction of the crime. This was done without unreasonable delay. Then followed the delivery of the prisoner by the Louisiana authorities to the proper sheriff of the proper county of the proper state wherein it had then been determined the murder had been committed. Up until this time, about 9:30 P.M., April 10, it would have been impossible to have regularly and properly taken the prisoner before a magistrate. By that time of night no court or magistrate's office would be open since they are open only in the daytime. Within about an hour and a half, the confession was signed. The proof, even the accused's own testimony, amply shows that the confession was freely and voluntarily given, and that there was no physical mistreatment, threats, or psychological pressure used in obtaining the confession.

There was no unreasonable delay in taking the accused before a magistrate insofar as the time of the confession is concerned. Directly in point is the case of Moore v. State, supra. The basic facts in the Moore case in reference to the making of the confession are strikingly similar to those in the case before us.

We have given very careful consideration to all the facts and circumstances leading up to and during the making of the confession in this case. We are of the opinion that there are few cases where a person charged with a crime has been given fairer or more considerate treatment. We commend the officers who had custody of the accused from the time he was delivered to Casa-

nova and Dupre in Virginia until he was brought to trial. Even the accused testified he had received nothing but fair treatment.

We find no reversible error. The case is affirmed and Friday, December 17, 1954, is set as the date for the execution of the death sentence.

Affirmed and Friday, December 17, 1954, fixed as date of execution of sentence.

All justices concur.