PARKER *v.* STATE

No. 42295 May 21, 1962 141 So. 2d 546

*Berry & Yarbrough,* Gulfport, for appellant.

334

*G. Garland Lyell, Jr.,* Asst. Atty. Gen., Jackson, for appellee.

Lee, P. J.

The grand jury of Jackson County indicted Perry Parker, Donald Lowery and Benny Jack Williams, jointly, for the murder of Rufus Charles Braddock. Parker was granted a severance, and, upon his trial, he was found guilty as charged and was sentenced to suffer the death penalty in the manner provided by law. From the judgment entered thereon, he appealed to this Court.

The evidence for the State showed the circumstances and manner of this death as follows: Braddock was fifty-three years of age. He was married and had two children. He lived in the City of Laurel, where he had worked for Masonite Corporation for twenty-four years. About eight o'clock on the morning of July 25, 1961, he left home in his 1961 Ford Galaxie ostensibly to go to Crossett, Arkansas. When his wife saw him again, he was in a funeral home in Laurel dead.

About 2:30 in the afternoon of July 26, 1961, Freeman Roy Northrop and James C. Cumberland, neighbors, who lived in the rural community of Lizana in Harrison County, went swimming at Cable Bridge on Wolf River in Harrison County. They took their wives and five of Northrop's children. They came out after staying in the water about forty-five minutes to an hour. The men and boys got their clothes from the car, and went several hundred feet to a thicket in order to change into their street clothing. Cumberland, happening to look ahead a short distance, saw a dead man, lying on his back, without a shirt or shoes, and clad only in a pair of trousers. These people hurried to the home of the constable of the district, reported their discovery,

and accompanied the officer to the scene. An ambulance was obtained and the body was carried to a funeral home where it was identified. At that time, five photographs of the body were taken. Four of the pictures showed the head and neck with distinctive marks around the throat. The fifth picture showed lacerations or lesions on the back. The finders did not move the body at the time. Cumberland testified that the first four photographs fairly and accurately represented the marks that he saw on the throat of the deceased at the time the body was lying in the woods.

Dr. Henry D. Haberyan, a pathologist, did an autopsy on the body of Braddock at seven o'clock on the same evening for the purpose of determining the cause of death. He identified the subject as being the body which was depicted in the photographs. He explained that there were a number of unimportant and superficial lesions of the skin on the back and neck. The lesions of the skin and subcutaneous tissues of the neck indicated strangulation. On the back, the lesions were up and down that area, and he observed dirt and leaves or other vegetable matter in them. In his opinion, death was due to strangulation, which occurred perhaps twenty-four to forty-eight hours prior to his examination. He explained that a contusion is a bruise and a laceration is a superficial cut. There is no distinguishing characteristic between a laceration before or after death. The material in the lacerations suggested that the body was dragged over the ground either prior to or just after death. He said that, if there is a cut or laceration on a dead body in such manner as blood could flow out, there can be some outflow of blood.

At this time, a hearing as to the admissibility of a confession by the defendant, was conducted by the court in the absence of the jury. Douglas Thompson, a deputy sheriff, was placed on the stand. He said that Parker had expressed a desire to make a confession. He and

Gaston Hewes, county attorney, asked questions of the accused, and Robert Daniels, a chancery court reporter, took the questions and answers as they were asked and answered. No promise or threat or force of any kind was used to induce the making of the statement. It was given freely and voluntarily. After it was completed, the court reporter typed it. The witness read it. It was accurate and contained what was asked and what the defendant said. He was present when Parker read the statement, signed it, and swore to it before Daniels, who was also a notary public. On cross-examination, the witness said that he had talked to the defendant once before. A tape recorder was used only when Daniels was operating it that day, at which time he was also taking the statement in shorthand. This statement was taken several days after Parker had returned from California. The defendant told the witness that he had been taken before a judge in California about two days after his arrest where the charges in Mississippi were explained to him. After Parker's return to Mississippi, he was not taken before a magistrate before he made the confession. The defendant had visitors while he was in jail. In his first talk with Parker, the witness advised him that he had a right to get an attorney if he wanted one. The defendant never asked him to call any relatives.

Parker then took the stand. He said that, after his arrest, he was held in California for five or six days; and that he was not given the benefit of counsel. An "F.B.D." man brought the extradition papers before a judge, where he was advised as to the charges. The man handed him and Lowery a paper that said that they were wanted in Mississippi for murder. He had then been under arrest two days. He said that he was under an emotional strain while being questioned and the statement was being taken down. On cross-examination, he said that he had known Gaston Hewes a

long time, and that they asked questions and that he answered them. He said that neither Hewes nor anybody else threatened him, and that nobody made any promises. He said that he gave the statements freely and voluntarily. His wife was in jail at the same time. He was also turned loose in the "bull pen"; and he admitted that he did not ask Holleman, the district attorney, or Hewes, the county attorney, to get in touch with anybody for him.

After this preliminary hearing, the court held that the confession was admissible in evidence, and the jury was returned to the jury box. Douglas Thompson, who had been on the stand, returned, and said that, after Parker and his co-indictees were returned from California, he and Gaston Hewes, county attorney, took the statement from Parker. Robert Daniels, the Chancery Court Reporter of Harrison County, took it down in shorthand as the questions were asked and answered. All of this was reduced to writing. He said that there were no threats or promises of any kind. The completed statement was typed. Perry Parker read it in the presence of the witness and the witness also read it. Parker swore to it and signed it in the presence of Daniels, who was also a notary public. The whole statement, consisting of fifty-three pages, was then offered in evidence.

Space will not permit the inclusion of the entire confession in this opinion. It is sufficient to say however that it disclosed that, on Tuesday morning, July 25, 1961, Parker, his wife Margie, Benny Jack Williams and "Donnie" Lowery set out from Gulfport in Williams' car on a trip to Hattiesburg to find Williams' wife. The car broke down and was later sold for $20. A preacher and his wife came along and took them to Hattiesburg. They were not able to find the woman while they were in Hattiesburg. Margie, in some unexplained way, met up with Braddock, and she intro-

duced him to her companions as her husband. Braddock agreed to drive them to Gulfport. Along the way, they stopped at several places and drank beer and whiskey. At Wiggins, Braddock bought Margie some clothes in the store of Earnest Yeager & Sons. Thereafter, at Circle Inn in Lyman, he again bought whiskey. When they left, he and Margie were in the back seat and the others were in front, with Parker driving. Along the way, before Williams parted with possession of his car, they transferred all of their effects to Braddock's car, together with the old tag from the car which Williams sold. Braddock suggested several times that they get something to eat, and the others did eat, but he ate very little, if anything. They stopped at a Shell station on the beach at the intersection of Beach and Thirtieth Streets where they filled the tank and Braddock paid for it with his credit card. Thereafter, Braddock went to sleep in Margie's lap.

As they continued down Highway 90 toward Pass Christian, after both Braddock and Margie were asleep, Parker, Williams and Lowery decided to get Braddock's money. Benny Jack reached back and got it. They divided it, $42 each to Williams and Lowery and $84 to Parker for his and Margie's part. They then stopped, bought another fifth of liquor, splitting the price between them. They decided to dump Braddock somewhere, finally concluding that it would be better to do so in the area from which they came. So, they turned around, and Williams took Margie's place in the back seat. They drove east through Gulfport, Biloxi and Ocean Springs. They stopped at Earl Bond's Truck Stop, where, as the others sat in the car, Parker bought a fifth of Early Times liquor and cigarettes. Parker, at the wheel, then drove angling across the highway into a country road, that was blacktopped, for about five or six miles. Here he stopped the car, and Braddock, "passed out", was lying with his head in Williams' lap.

Both Williams and Parker put their socks on their hands. Parker held Braddock's hands and Lowery held his feet. Williams put a handkerchief around Braddock's neck and tightened it. The man gasped for breath, then was still. Parker heard the noise of a bowel movement, and Lowery said ''Well, he has gone now. He done took his dying * * * (an unprintable word, meaning a movement of the bowels.)'' Williams, repeatedly, in words too vulgar and obscene to appear in print, declared that Braddock would never again engage in sexual intercourse. Parker was of the opinion that the man was dead at that time. He said that he touched the man with the back of his hand, and that ''he was as cold as that desk'', indicating.

Parker then described the course that they pursued to reach Cable Bridge. When they got there, he told his companions that this was as good place as any to dump the body. He and Williams, on opposite sides, were carrying the body from the car when he fell down. Williams then put himself between the legs, and, walking backward, dragged the body to the place where it was left. The statement described how they left the scene and traveled over a different course. When they reached Highway 90, Parker drank a quantity of liquor, gave the wheel to Lowery, and remembered very little thereafter until he woke up in Louisiana. They got rid of Braddock's clothes and the socks which they used by throwing them in a culvert in a desert area in Texas. They arrived in Los Angeles three or four days after the killing. He detailed the various places to which they went and the various things which they did to get money. He pawned Braddock's watch at the Derby for $3. They had left Williams at the home of his father-in-law, and Parker and Lowery were negotiating for the sale of Braddock's car when they were arrested. He said that an ''F. B. D.'' man, by the name of Fitzsimmons, questioned him and inquired whether they knew Braddock.

Finally, he told the story along the same line as this statement, and Lowery wrote out his statement about it. These statements were made by them freely and voluntarily, and they were taken before a judge about two days after their arrest, where they were told of the charges which had been made against them in Mississippi.

The confession further stated that, after they had been returned to Mississippi, Parker went voluntarily with Douglas Thompson and Mr. Rosetti for the purpose of pointing out the scene where the crime was committed. They went to Earl Bond's truck stop and drank coffee, where they were met by two peace officers from Pascagoula. He was sure that he could identify the place, and he took them to the spot, to the best of his ability, where they strangled Braddock. He was positive that it occurred on the road, as indicated, which was about five miles north of Highway 90 on what was termed the Singing River Road, between Ocean Springs on the west and Pascagoula on the east. He also pointed out the place where they dumped the body.

The supplementary statement, offered in evidence by the defendant, appears to have been given to Gaston Hewes later during the same day when the original was made. In this, Parker told Hewes that he had known him a long time. He repeated an acknowledgment of his guilt. He said that he did not have a friend in the State that he could turn to and get a meal; and that his brothers, sister and brother-in-law had all turned him down because he had been a drunkard, etc. In other words, it constituted an acknowledgment of his guilt and a plea for mercy. Hewes, at the end of the statement, told Parker that he had no doubt that Parker had cooperated fully, but "Of course we can't make you any type of promises. We cannot do that, but it is not all bad in you."

Following the original and supplemental statements, inasmuch as Parker had described the place where the killing had occurred and the place where the body was dumped out of the car, Thompson said he asked Parker whether or not he would be able to identify and locate these places. Parker replied that he could and would do so voluntarily. Consequently Thompson got in touch with the Sheriff of Jackson County and the sheriff and his deputy met him and Parker at Earl Bond's place. They took a blacktop road and went north until they came to a big sign "Singing River Fishing Camp." They turned right and went three or four miles where Parker pointed out the place to stop. At this point, he identified a trash pile that he saw on the night of the killing. He said also that he threw a bottle out of the car. The officers found a bottle, and it was Parker's opinion that this bottle was the one which he threw out of the car. The witness testified that the place, which Parker pointed out as the spot where the killing occurred, was in Jackson County. He said that they went to the place where the body was found, and that this place was in Harrison County. Both places were in the State of Mississippi.

The State rested at this point, not having introduced any of the persons who saw the defendant and his co-indictees and Margie with Braddock that day. However, the defendant offered two witnesses, Norris Saucier and T. J. Bullock. Saucier testified that he was operating the Circle Inn on July 25, 1961; that Perry Parker, Donald Lowery, Benny Jack Williams, Margie Parker and the deceased came into his place. He had known all of these parties, except the deceased, Braddock, for some time. He was sure that they had been drinking. Braddock looked like he was "pretty drunk." It was in the afternoon, and they were in a white 1961 Ford car. He looked at some of the photographs, which had been introduced in evidence, and he identified Brad-

dock as the man, whom he had seen with those people. He said that the man did not look as bad the day he saw him as he did in the photographs. Bullock, on examination, was found to know nothing which was admissible in the case.

The appellant assigned and has argued three alleged errors on the part of the trial court, namely, that (1) The statements of the appellant should have been excluded; (2) The jurisdiction was in Harrison and not Jackson County; and (3) The court erred in failing to require the production of a tape recording of the confession.

## ADMISSIBILITY OF THE CONFESSION

The appellant says that, in accordance with California law, he should have been taken before a magistrate at once, at least within two days after his arrest, and that the failure to do this vitiated any statement made in California, and tainted the subsequent confession, obtained in this State; that he was held incommunicado; and that the State was late in producing the statements.

The evidence showed that this confession was made without coercion, threats or promises of any kind, and that it was also given freely and voluntarily. As stated, it consisted of fifty-three pages. It was taken down in shorthand by the court reporter, who also ran a tape recorder presumably for his own benefit and to assure accuracy. It purports to, and undoubtedly does, relate the most minute details of what occurred on that bizarre criminal adventure. The language was that of the appellant himself, not what some witness, from recollection, thought that the appellant said. The confessor was so elaborate in the details that, in some instances, his answer to a single question covered two to four solid pages of the record. Not only did the evidence for the State show that the confession was free and voluntary, but the appellant himself, when he took the stand in

the preliminary examination on the question of admissibility, admitted that neither Hewes, the county attorney, nor anybody else, threatened him or made him any promises. Instead, he swore that he gave the confession freely and voluntarily. Under all of the circumstances, coupled with the detailed content of the instrument itself, it is conclusive beyond every reasonable doubt that the confession was freely and voluntarily given, without force, coercion, threats or promises of any kind whatever. If a confession is ever to be used against an accused, this is one which meets every requirement of the law. There was no dispute about it. It is not necessary therefore to apply the principle stated in Street v. State, 200 Miss. 226, 26 So. 2d 678, and the authorities there cited, to the effect that this Court will not, where the evidence is conflicting, disturb the finding of the trial court unless it appears to be clearly contrary to the evidence.

The appellant, in the confession, said that he told an officer in California about his connection with the killing; and that he was taken before a judge about two days after his arrest and informed of the charges in Mississippi. Obviously there was no violation of the directory statute of California in dealing with a suspect of crime. But, at any rate, the State made no attempt to show by such official what the appellant said to him.

Parker was not kept incommunicado. His wife was in the jail at the same time. He was placed in the "bull pen" with other prisoners. He saw visitors. He was told, on the first occasion when Thompson talked to him, that he could have a lawyer if he wanted one. True, he might be shaken up when he reflected over the diabolical and gruesome nature of the crime. It would be difficult to conceive how any human being would reach such a state of bestiality that he would be insensible to the infamy of a crime which the evidence in this case records. The reason why

he perhaps had no more company can doubtless be found in his supplementary statement to the effect that his brothers, his sister and his brother-in-law had all turned him down because of his past conduct.

In the case of Culombe v. Connecticut, 367 U. S. 568, 6 L. Ed. 2d 1037, 81 S. Ct. 1860, the Supreme Court of the United States had under consideration, on certiorari, the case of Culombe, who was a thirty-three year old illiterate mental defective of the moron class who was suggestible and subject to intimidation. He was taken into custody by state police officers on Saturday afternoon and held without benefit of counsel, although he requested counsel. He was not arraigned promptly, as required by state law, and was not advised of his constitutional rights. He was questioned intermittently by police officers until Wednesday night. At that time, he was upset by seeing his wife and sick daughter, and, at that time, he was urged by his wife to tell the truth. It was held that, under all of the circumstances, the confession was not voluntary. Consequently, his conviction of murder was set aside on the ground that the admission of the confession deprived the petitioner of due process. Justice Frankfurter announced the judgment of the court and wrote an elaborate opinion, which was concurred in by Justice Stewart. Chief Justice Warren wrote a separate opinion, concurring in the result, but joined in a separate opinion by Justice Brennan. He expressed doubt as to whether the opinion of Justice Frankfurter had clarified the applicable principles. Justice Douglas, in a separate opinion, concurred in by Justice Black, emphasized the denial of the petitioner's request that he be given the right of counsel. Justice Brennan was of the opinion that all of the confessions were coerced. Justice Harlan, in an opinion concurred in by Justices Clark and Whittaker, dissented, and was of the opinion that there was no constitutional infirmity in the standards which were

used by the Connecticut courts in evaluating the voluntariness of the confessions.

In spite of the divergent views among the justices, the opinion of Justice Frankfurter is very informative as to the difference between the Federal and State rules in such matters. It explained the origin and applicability of the rule in McNabb v. United States, 318 U. S. 332, noted that the States have not adopted a similar exclusionary principle, and called attention to the fact that the court had not extended its rule to State prosecutions as a requirement of the Fourteenth Amendment. The opinion said: "In 1943 this Court, in McNabb v. United States, 318 U. S. 332, drew upon its supervisory authority over the administration of federal criminal justice to inaugurate an exclusionary practice considerably less stringent than the English. That practice requires the exclusion of any confession 'made during illegal detention due to failure promptly to carry a prisoner before a committing magistrate, whether or not the "confession is the result of torture, physical or psychological . . . ." ' Upshaw v. United States, 335 U. S. 410, 413. Its purpose is to give effect to the requirement that persons arrested be brought without unnecessary delay before a judicial officer — a safeguard which our society, like other civilized societies, has found essential to the protection of personal liberty.

"The McNabb case was an innovation which derived from our concern and responsibility for fair modes of criminal proceeding in the federal courts. The States, in the large, have not adopted a similar exclusionary principle. And although we adhere unreservedly to McNabb for federal criminal cases, we have not extended its rule to state prosecutions as a requirement of the Fourteenth Amendment. Gallegos v. Nebraska, 342 U. S. 55, 63-64 (opinion of Reed, J.) ; Brown v. Allen, 344 U. S. 443, 476; Stein v. New York, 346 U. S. 156, 187-188; cf. Lyons v. Oklahoma, 322 U. S. 596, 597- 598, n.

2; *Townsend* v. *Burke,* 334 U. S. 736, 738; *Stroble* v. *California,* 343 U. S. 181, 197.''

In Footnotes 38 and 53, the writer, as proof of his assertion that the States have not adopted an exclusionary rule similar to that pronounced in the McNabb case, set out the styles of State cases, with the book and page numbers, showing where the decisions can be found. This list includes all of the fifty states except Alaska.

In the present case, Parker was certainly neither a moron nor an illiterate mental defective. His own language, used in the confession, demonstrated a high degree of intelligence. In the first conversation that the deputy sheriff had with him, he told Parker that he could have an attorney if he wanted one. The deputy said that he had talked to Parker only once before the occasion when the confession was taken. Parker was put under no persuasion from his wife, who was also in jail at the time. He did not ask for relatives; but instead frankly stated that he had acted so badly that they had abandoned him.

■■ ■ It is true that Parker was not taken before a magistrate during the several days that he was in jail between his return from California and the making of the confession. But, since the confession was free and voluntary and was not induced by threats, force or promises, the omission to have a committing trial did not nullify its validity.

■■ ■ Of course, Sec. 2473, Code of 1943, Rec., requires that ''Every person making an arrest shall take the offender before the proper officer without unnecessary delay for examination of his case'', but it does not follow that confessions, freely and voluntarily made while in custody under an unlawful arrest, are to be excluded on account of the illegality of the arrest. Quan v. State, 185 Miss. 513, 188 So. 568; Moore v. State, 207 Miss. 140, 41 So. 2d 368; Winston v. State, 209 Miss. 799, 48 So. 2d 513; Lewis v. State, 222 Miss. 140, 75

So. 2d 448; Crouse v. State, 229 Miss. 15, 89 So. 2d 919. Owing to the wide area over which this investigation naturally spread, it required time to determine whether suspicion amounted to probability of guilt.

The trial court properly overruled the motion to exclude, and was clearly correct in admitting the confession in evidence.

■■ ■ The supplementary statement was put in evidence by the appellant. It was made after the confession had already been given. As heretofore stated, it did not go into the details of the crime. It evidenced remorse for the appellant's act, and might be in fact considered as a plea for mercy. When the appellant said what he did, in that instance, the county attorney promptly told him that they could not make him any type of promises. Obviously, the appellant cannot claim harm when he was the one who was responsible for the introduction.

## WHERE WAS JURISDICTION?

The appellant contends that the evidence showed that the death of the decedent occurred in Harrison County; that the prosecution was commenced in that county; and that the Circuit Court of Jackson County therefore had no jurisdiction. He says that, at least, the killing was not shown, beyond reasonable doubt, to have been fully consummated in Jackson County.

Sec. 2429, Code of 1942, Rec., provides as follows: "When an offense is committed partly in one county and partly in another, or where the acts, effects, means, or agency occur in whole or in part in different counties, the jurisdiction shall be in either county in which said offense was commenced, prosecuted, or consummated, where prosecution shall be first begun."

Sec. 2430 of the Code provides in part as follows: "Where the mortal stroke or other cause of death occurs or is given or administered in one county, and the

death occurs in another county, the offender may be indicted and tried in either county * * * ''

This Court has held that, when the fatal wound is inflicted in one county, if a prosecution is commenced in that county, such county has exclusive jurisdiction over the killing; and the county, where death occurs, has no jurisdiction. Coleman v. State, 83 Miss. 290, 35 So. 937; Atkinson v. State, 132 Miss. 377, 96 So. 310. In like manner, it is clear from the statutes that, if the prosecution is first commenced in the county where death occurs, that county has exclusive jurisdiction.

It is true that the county attorney, on August 3, 1961, made an affidavit in the County Court of Harrison County charging that the defendant and his co-indictees, in that county, had killed and murdered the deceased. But thereafter the officer filed a motion to dismiss the prosecution for the reason that the complete act of murder was committed in Jackson County instead of Harrison. This motion was sustained on September 25, 1961.

If the death occurred in Harrison County, manifestly that county had exclusive jurisdiction even though the cause of death was given in Jackson County, because a prosecution was commenced in Harrison County. But, on the other hand, if both the cause of death was given and the death occurred in Jackson County, that county alone had jurisdiction even though a prosecution had been commenced in Harrison County.

The defendant, in his confession, described the place where the strangulation occurred and the manner in which he and his confederates consummated it. Benny Jack Williams was holding the garroting material tightly around the neck of Braddock, who gasped for breath and then was still. Lowery's exclamation, as heretofore given, shows that he thought Braddock was dead. Benny Jack Williams' utterance, as heretofore stated, confirms his belief that the man was dead. Parker was of the opinion that the man was dead — he touched him with

the back of his hand and said that Braddock was "as cold as that desk." He also admitted that he went with the officers voluntarily and pointed out the spot where the crime was committed. He described the location and how it was reached. From that point, he conducted the officers to the place where the body was dumped in the thicket. The evidence showed that the place, so pointed out as the scene of the consummated crime, was in Jackson County, and that the place, where the body was left, was in Harrison County.

The pathologist, who was of the opinion that death resulted from strangulation, said that there can be a passage of blood from the vessels into the tissues after death. While the material, which he found in the lesions on the back, suggested that the body was dragged over the ground either prior to or just after death, he said that, after a person is dead, if there is a cut or laceration in such a manner that blood can flow out, there can be bleeding from such cut or laceration. The testimony of the doctor, in showing the cause of death, does not discredit in the least the statement of the appellant as to the place where the killing was consummated. On the contrary, it showed that the lesions on the back of the deceased could have been made after his death. Consequently, such evidence is consistent with the appellant's version of the place of death.

██ ██ The State of course had the burden of proving venue beyond a reasonable doubt before the jury could bring in a verdict of guilty. Presley v. State, 217 Miss. 112, 63 So. 2d 551, and authorities there cited. Under the State's first instruction, the jury was required to find that the murder was committed in Jackson County before they could convict the appellant. The evidence was ample to warrant the jury in finding beyond a reasonable doubt that the cause of death was given and the death itself occurred in Jackson County.

Consequently, the trial court did not err in overruling the motion to quash the indictment and remove the cause to Harrison County, either at the beginning, or during, the trial.

## THE PRODUCTION OF THE TAPE RECORDING.

■■■ The appellant also contends that the trial court erred in failing to require the State to produce the tape recording, made at the time of the confession.

It developed during the trial that the chancery court reporter, Daniels, who took the confession of the appellant in shorthand, also ran his tape recorder, presumably for his own benefit. Neither the district attorney nor any representative of the State had such recording, but the same was in the possession of Daniels. The court explained to appellant's counsel that they could probably get the recording from Daniels, if they wanted it. It appears that no previous request had been made of the State to produce it. Counsel for appellant made no request of the court to require Daniels to furnish the same to them. Only one word was missing in the confession as transcribed, and Douglas Thompson testified that the word was ''drunk'', which jibes completely with the context of the confession.

In Ray v. State, 213 Miss. 650, 57 So. 2d 469, where the trial court permitted the State to introduce a tape recording of the appellant's confession, this Court held that such action was not error where the recording was properly authenticated.

In Sanders v. State, 237 Miss. 772, 115 So. 2d 145, the sheriff, the district attorney, and the county attorney were present when Sanders made a confession that he killed Carter. The county attorney, at the time, made a tape recording of what transpired. The State's evidence as to the confession was offered through the sheriff, who narrated it to the jury in accordance with his best recollection; but he conceded that he could not remember every detail thereof verbatim. Counsel for

the appellant moved the court to require the State to produce the recording for use in cross-examination. The court overruled the motion; and this Court, on appeal, held that, under the circumstances, such action of the trial court constituted reversible error.

In the present appeal, however, the officer, through whom the confession was offered, did not undertake to recite the detailed story which Parker unfolded. What the accused said was put down in shorthand by a court reporter. After the notes were transcribed, the appellant read the entire statement. He then signed it, and swore to it before Robert L. Daniels, Jr., who was also a notary public. When counsel for appellant, reading from the statement in several instances, asked the officer about his recollection, the officer remembered the exact language. For instance, in the only place in the whole confession where there was an omission, as stated above, counsel read an answer as follows: ''When we started to leave, Norris Saucier met us at the door, coming in when we were fixing to leave. I was helping Mr. Braddock down the steps. It was kinda bad getting out and he was pretty . . .'', and then asked ''do you know what was said there?'' The officer replied: ''I do. * * * Mr. Braddock was pretty drunk.'' In other words, there was no evidence of error or inaccuracy in the statement whatever. Besides the State was not in possession of the recording. Its counsel informed counsel for the appellant where it could be reached. The court, if requested, no doubt would have required Daniels to present the recording. But counsel for the appellant sought no aid from the court to see that such information was obtained from Daniels. Manifestly the trial court, under the circumstances, cannot be put in error on account of the failure of appellant's counsel to have access to the recording. Besides there is nothing in this record to indicate that the lack of access to this re-

cording resulted in any prejudice whatever to the appellant.

It is fortunate indeed that human society is not often required to ferret out and punish so devilish and diabolical crime as that to which the State was called in this instance. It is not unreasonable to conclude that the woman, Margie, was used as the bait with which to trap the unwary Braddock. He bought her clothes and repeatedly paid for the drinks. When he was so completely under the influence of liquor that he "passed out", her companions took his money. Their greed and avarice did not stop at that point — they coveted their victim's new automobile. Instead of sparing his life and leaving him by the side of the road where some good Samaritan might give him aid and succor, they chose rather to silence his tongue forever, and leave his mortal remains to be devoured by the beasts of the field and the vultures of the air, with the purpose and in the hope that the identity of his murderers could never be established. If death is ever to be imposed as punishment for the crime of murder, this is certainly an instance for its exaction — the jury were evidently unable to find any extenuating circumstances whatever.

The appellant was given a fair and impartial trial. There is no prejudicial or reversible error in the record. Guilt was conclusively established beyond every reasonable doubt.

The judgment of the trial court must be, and it is, affirmed.

Affirmed and Friday, June 29, 1962, is fixed as the date for the execution of the death penalty in the manner provided by law.

All Justices concur.