412 So.2d 732 (1981)
Joseph SCRUGGS
v.
STATE of Mississippi.
No. 52866.
Supreme Court of Mississippi.
November 25, 1981.
Rehearing Denied April 21, 1982.
Roy Pitts and Franklin M. Coleman, Meridian, for appellant.
Bill Allain, Atty. Gen. by Wayne Snuggs, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROBERTSON, P.J., and BROOM and HAWKINS, JJ.
BROOM, Justice, for the Court.
Murder conviction and life imprisonment sentence resulted from the trial of the defendant/appellant Joseph Scruggs in the Circuit Court of Wayne County. The indictment charged him with the murder of Richard Roberts while "engaged in the commission of the crime of armed robbery." On his appeal, defendant Scruggs argues that the lower court erred in: (1) allowing the defendant's confession into evidence; (2) sentencing him to life imprisonment under Mississippi Code Annotated § 43-21-159(3) (Supp. 1981), which statute he contends is unconstitutionally vague and lacking in standards; and (3) failing to dismiss the charge on account of the state's alleged failure to divulge "exculpatory material" as requested. We affirm.
Facts of the case, summarized, are these. On October 29, 1979, Wayne County Sheriff *733 Farrior was notified in substance that an accident had occurred south of Waynesboro. Arriving at the scene shortly after 5 a.m., the sheriff observed a blue 1979 Monte Carlo car in a ditch approximately 418 feet off Highway 45. No keys were in the car so the sheriff called a wrecker to have it towed to Waynesboro. When the front end of the car was picked up, the sheriff observed a red substance (later determined to be human blood) dripping from the car trunk. Pertinent public records revealed that the car was registered to Marvin Leach, Jr. of Newton County, and in Newton, Mississippi, telephones were listed in the names of Marvin Leach, Jr. and Marvin Leach, Sr. Opening of the car trunk was accomplished by "hot-wiring" the vehicle and pushing the button in the dash compartment which released the trunk lid. Two white male corpses, Richard Roberts and Marvin Leach, Jr., were in the trunk of the car which was moved to the Wayne County Fire Station. Agents of the Mississippi Crime Lab and State Highway Patrol were called in to assist in the investigation.
Defendant Scruggs and his companion, Dennis Hicks, were arrested by law officers acting without a warrant at about noon time or a little later on October 29, 1979. Their presence in the area had been reported by Mrs. Dot Hartley who advised the sheriff by telephone that she had seen the two boys at her store in Buckatunna. Another call to the sheriff was from a Mr. Sumrall who reported around 11 a.m. that he had seen two desperate appearing boys a few minutes earlier walking and "thumbing" on the road. Both Mrs. Hartley and Mr. Sumrall gave a description of the two boys who were then spotted on Highway 45 by law officers Cochran and Snyder. The officers testified that the boys broke and ran into the woods when they saw the officers, but were later captured. The next day at about 5 p.m., the defendant made an incriminating statement which went into evidence at trial. Other facts will be set forth on the following pages.
WERE THE DEFENDANT'S INCRIMINATING STATEMENTS INADMISSIBLE BECAUSE THEY WERE THE PRODUCT OF AN ILLEGAL ARREST AND NOT VOLUNTARILY MADE? The first contention is that the warrantless arrest of the defendant was without probable cause and therefore illegal. On that basis it is urged that his later incriminating statement was poisonous fruit of the illegal arrest and inadmissible into evidence.
Our established law is that a warrantless arrest may be made if it is established that (1) a felony has been committed, and (2) reasonable grounds exist to suspect and believe that the person arrested committed the felony. Powell v. State, 394 So.2d 326 (Miss. 1981); Jones v. State, 358 So.2d 414 (Miss. 1978). Without doubt the first element of probable cause  belief that a felony had been committed  is present here. The evidence is clear that the two arresting officers had seen the two homicide victims' bodies (both obviously shot and one stabbed) in the trunk of the Leach car abandoned on a road in a rural area of Wayne County.
Thus we turn to the second element of probable cause for defendant's arrest: Did the officers have reasonable grounds to believe that defendant Scruggs and his companion Hicks committed the felony? Testimony was that the officers obtained a gasoline credit card receipt from the victims' car reasonably indicating that the victims had purchased gasoline at Cheeseman's Gulf Station in Eight Mile, Alabama on October 28, the date of their deaths. Having the receipt, one of the officers called Mr. Cheeseman who remembered not only the gasoline sale, but also the car in question. Cheeseman also recalled that at the time he sold them the gasoline the person on the passenger side of the front seat of the car was Leach who paid for the gasoline with a credit card. Cheeseman remembered that seated on the rear seat of the car were two young long-haired white boys, one of whom wore a blue plaid shirt and the other who had a red handkerchief in his back pocket.
Some time during the morning of October 29, Mrs. Hartley reported to the sheriff by telephone that two boys who she thought *734 acted suspiciously came in her store in Buckatunna and bought soft drinks. Her testimony was that the two boys were hitchhikers; each had long hair; each carried a blue coat; and each appeared to be nervous. The older boy had on a shirt which appeared to have a blood spot on the shoulder. According to her, the younger boy had a red handkerchief hanging out of his pocket.
Additionally, the sheriff received a telephone call from a Mr. Sumrall at about 11 a.m. on the 29th reporting that he had seen two white boys hitchhiking on Highway 45 between Mount Zion Road and Buckatunna some two to three miles south of where the victims' car was found. Sumrall described the boys as having long hair with one of them wearing a blue coat, and he indicated that both of them appeared desperate for a ride. The aforesaid information concerning the two boys had been received by the sheriff's office and relayed to Officers Cochran and Snyder who were patrolling the area near the scene of the abandoned car. Having received this information, the two officers observed two young, long-haired white boys a short distance south of Buckatunna on Highway 45 each carrying a coat in his hand, one coat being a loud blue and the other a western-styled denim coat. According to the officers, the boys appeared to be nervous, and hurried into the woods after seeing the police car. Officer Cochran asked them to stop, but they continued to run farther and surrendered a short time later when surrounded by police officers.
After the two boys surrendered, they were ordered onto the ground, handcuffed, placed in the patrol car, and carried to the sheriff's office without being informed that they were under arrest for murder or armed robbery.
The defendant's brief asserts
that they were under arrest for murder or armed robbery; rather, the sheriff testified at the preliminary hearing that there were no formal charges entered at that time. "I guess they were under arrest for investigation."
We think it significant that prior to taking the two boys into custody, the law officers had received descriptions (including the sex, age, race, hair style, and clothing) of the boys from the store owner (Mrs. Hartley) and from Cheeseman, the gas station operator in Alabama. The descriptions received from the two sources substantially matched that of the two boys. Additionally, before they made the arrest the officers had the testimony of citizen Sumrall who had just seen the two boys hitchhiking. Then while searching the area where the "boys" had recently been seen, an area not far from where the car which contained the two bodies had been discovered, Officers Cochran and Snyder observed defendant Scruggs and Hicks fitting the general description which had been given them of the boys who were last seen with the victims while alive. Observation of the boys showed they appeared to be desperately seeking to hitch a ride. Before the officers even indicated to them that they were suspects, the boys suddenly ran off into the woods and continued their flight after obviously knowing that the officers were interested in them.
Under these circumstances we are unwilling to hold that the officers were illegally acting when they took Scruggs and Hicks into custody. It matters not that the arrests at that time were for investigation because the arrests were made with probable cause. Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) and Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), relied upon by the defendant, are not controlling because they were cases where the investigatory arrests were accomplished without probable cause.
Secondly, the appellant argues that his inculpatory statement was inadmissible into evidence because it was not voluntarily given. In support of this argument he claims, first, that he was not taken before a magistrate for a period of at least 72 hours. Our scrutiny of the record indicates that defendant Scruggs (and Hicks) were taken into custody in the early afternoon of October *735 29 and on the following day at about 5 p.m. (less than 30 hours later), Scruggs by his own statement incriminated himself. It appears that an affidavit was filed against the defendant in justice court on October 31 at some time not certain. He contends that under Mississippi Code Annotated § 99-3-17 (Supp. 1981), failure of the sheriff to take him before the magistrate "without unnecessary delay" is an example of "official misconduct" within the provisions of Brown v. Illinois, supra.
Reid v. State, 266 So.2d 21 (Miss. 1972) held:
It is only when a confession is obtained as a result of unreasonable delay in taking the prisoner before a magistrate for a preliminary hearing that his confession of guilt is to be excluded on this basis. (Emphasis added).

Id. at 26.
See also Dickens v. State, 311 So.2d 650 (Miss. 1975). Here no contention below was made, nor is it shown that the confession resulted from the delay in presenting the case to a magistrate. Cases relied upon by the defendant are based on the federal McNabb-Mallory rule and are not in point on this issue. Our opinion in Parker v. State, 244 Miss. 332, 141 So.2d 546 (1962) noted that the rule of McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) was based upon the supervisory powers of the United States Supreme Court over the lower federal courts and had not been extended to the states. See also Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957). We declined adoption of a like rule for Mississippi, and reasoned that inasmuch as the confession was free and voluntary and not induced by threats, force or promises, the omission to have a "committing trial" (preliminary hearing) did not nullify its validity. 244 Miss. at 347, 141 So.2d at 552. In Tyson v. State, 237 Miss. 149, 112 So.2d 563 (1959), reversed for other reasons, the defendant was incarcerated and interrogated for six days without being taken before a magistrate prior to confessing. There we held that the delay was one factor for consideration in determining whether a confession is valid, and such determination should be made by means of the totality-of-the-circumstances analysis of the voluntariness of a confession.
Scruggs complains that he was held incommunicado for a period of at least 72 hours, but the record shows otherwise. Although Scruggs more than once informed the sheriff that he wished to speak to his mother, the sheriff testified that he allowed Scruggs to dial his mother's telephone number, but Scruggs failed to reach her because the line was busy. After the defendant failed several times to reach his mother because of busy signals, the sheriff asked the telephone operator to break through and thereby Scruggs' mother was reached. At the suppression hearing and at the trial in chief, the defendant testified that no officer either threatened or abused him in any manner. He testified that Sheriff Farrior was polite to him.
The defendant's brief states that "of special concern" is the fact that the defendant was only sixteen years old at the time of his arrest. Although the age of defendant and his request to communicate with his mother are to be considered in determining the voluntariness of his statement, these factors are to be considered along with other factors and circumstances presented by the record. Coleman v. State, 378 So.2d 640 (Miss. 1979); Davis v. State, 320 So.2d 789 (Miss. 1975).
Examination of the testimony shows that at about 7:30 a.m. on October 29, the two corpses were discovered. Several hours later (about 1 p.m.) the defendant Scruggs and his companion Hicks were arrested. Accepted by the trial judge was the sheriff's testimony that he interrogated the defendant shortly after the arrest at 1 p.m., and prior to interrogation he, the sheriff, fully advised the defendant of his rights. The sheriff further testified that when he concluded his advisory to the defendant about his rights, the sheriff asked him, "Do you understand?" and Scruggs replied, "Yes." During this interrogation the defendant gave no inculpatory statement. At *736 trial, Scruggs testified that he only told the sheriff that he understood his rights because he was "nervous and scared." It is interesting to note that Scruggs' testimony indicates that in a prior youth court proceeding, after which he was committed to a training school, he had had his rights explained to him.
According to the sheriff, he advised the defendant that he was investigating a murder. He further testified that the defendant was in his office from about 1 p.m. until 4 p.m. on October 29 and that the questions asked him pertained to his name, place of residence, and his activities during the preceding night. During this time, the defendant indicated no desire to make a telephone call and was removed to the city jail around 4 p.m. Around 11 p.m., after he had been carried to the hospital where tests were made on him by a doctor and hospital employees, the defendant asked permission to call his mother. Shortly afterwards when the sheriff arrived at the jail, he allowed the defendant more than once to attempt to telephone his mother, but each time her number was busy. During the remainder of the night, the defendant was not interrogated. On the next day (October 30), after the defendant was given breakfast, the record shows that the chief of police placed a city jail trusty in the defendant's cell. Strong indication is in the record that the purpose of the chief of police in placing the trusty in the cell may have been to see if the defendant would relate anything to the trusty. The trusty testified that he was not instructed as to why he was being put in the jail cell with the defendant. Established by the defendant Scruggs' testimony is the fact that the trusty made no effort to learn anything about the crime from the defendant. No serious argument appears in the defendant's brief concerning the trusty having been placed in his cell although he refers to the action in his rebuttal brief as being an exertion of "emotional and psychological pressure."
Testimony of highway patrol investigators Hooks and Rogers is that about 11 a.m. on October 30 they visited the defendant at the city jail. They both testified (which Scruggs denied) that they read the defendant his Miranda rights to which he replied that he understood and made no request for a lawyer. Further, they testified that Rogers asked Scruggs if he would like to call his parents, but he made no request to do so. To the contrary, it was Scruggs' testimony that he asked to call his mother but was not permitted to do so.
During the afternoon of that day, Alabama service station operator Cheeseman came and identified both defendant Scruggs and Hicks in a line-up. At about 5 o'clock that afternoon after the defendant was returned to the city jail, he was asked by the sheriff if he would like to make a statement. It appears that the defendant replied that he had already made a statement, to which the sheriff responded that he would not need a statement because an eyewitness had placed the defendant in the car. Testimony of the defendant on this was that the sheriff told him that he could help him or hurt him and that it was the defendant's last chance to tell the sheriff anything. Sheriff Farrior denied so advising the defendant. Then the testimony is that the defendant again expressed a desire to call his mother and the sheriff permitted him to place the call, but again he failed to reach her and was put back in his cell. A short time after being put back in the city jail a city policeman, Windham, overheard the defendant crying and made inquiry as to what was wrong. It was then that the defendant expressed a desire to talk to the sheriff. The sheriff came and when he asked the defendant if he wanted to see him, the defendant stated, "I didn't shoot the boys. Dennis shot them." According to the sheriff, he again advised the defendant of his rights and the defendant orally described the killings in which he put most of the blame on Hicks. His confession relates how he and Hicks hitched a ride with Roberts and Leach (the two victims), and during a subsequent stop Roberts and Leach were forced into the trunk of the car, and later brutally shot, stabbed and robbed. No one was present when the oral statement *737 was made except the sheriff and defendant Scruggs, who made no request at that time for permission to call his mother or anyone.
Following his making of the oral inculpatory statement, the defendant indicated his willingness to give a statement to a state investigator. At that time the defendant was given a written form which advised him of his rights and he stated that he understood his rights and what he was doing; then he signed a waiver. Testimony of the defendant at the suppression hearing was that he admitted stating to state investigator Hooks that he understood his rights. He made no request for his mother or a lawyer and at no time did the defendant ask for the questioning to stop. After Hooks advised the defendant that he could write his own statement, or that Hooks would do it for him, the defendant asked Hooks to write his statement because he (the defendant) was nervous. Hooks put the defendant's statement in writing after which the defendant read and signed it. A transcript of the statement implicating the defendant and Hicks is attached to this opinion as Appendix "A".
After the defendant's statement was reduced to writing, he agreed to go with the sheriff the next day to the crime scene. Again, according to the sheriff, the defendant asked to call his mother, and when the permission was granted, he tried to call her but the line was busy. Following two unsuccessful tries the sheriff prevailed upon the telephone operator to break in on the defendant's mother's conversation, and in that manner the defendant communicated by telephone with his mother for a few minutes. On the same occasion the sheriff also spoke to the defendant's mother and advised her that she could see the defendant the next morning at 11 o'clock. When she arrived on the next morning, preparation was being made by the sheriff to take the defendant to the scene which the defendant had agreed to do, and the defendant's mother was not permitted to see him until that afternoon.
Other significant testimony produced on behalf of the state was that of witness Henry Hosey. Some two months after the killings a pistol was found in the area where defendant Scruggs and Hicks entered the woods while running from the police. Location of the gun resulted largely from information given the sheriff by jail inmate Hosey, who testified that defendant Scruggs told him all about what occurred in connection with the two killings. According to Hosey, about a month after Scruggs' arrest, he and Scruggs were standing inside the jail where they could see the sheriff, who was spinning a pistol in his office. The inmate's impression was that Scruggs seemed to think that the pistol which the sheriff was handling was the gun used in the killings. Hosey said that a "funny expression" came on Scruggs' face, after which Scruggs went back to his jail cell and told Hosey about the killings. The version of the incident (as Hosey stated Scruggs told him) is quite different from that given by Scruggs in his statement and from Scruggs' testimony at trial. Hosey, appearing as a state's witness, testified that Scruggs told him that on the occasion of the killings, he (Scruggs) was armed with a knife and Hicks with a pistol. Hosey testified that Scruggs told him that Scruggs and Hicks escorted the two victims to the rear of the car and locked them in the trunk. Further, Hosey said that Scruggs told him Scruggs and Hicks then unsuccessfully tried to crank the car, and he (Scruggs) got the driver out of the trunk to crank it, but after it still would not crank they put the driver back in the trunk. Then Hosey's version was that Hicks told Scruggs that they were going to have to kill them both after which Scruggs used a knife and Hicks had the gun. As related by Hosey, Scruggs told him that Hicks shot both victims and Scruggs stabbed one and, after finishing the job, they were "just standin' up tripped [on drugs] just laughin'." They pushed the car off the road and walked down Highway 45 toward Mobile to an abandoned house where they spent the night. Hicks told Scruggs they should flip a coin to see "who shoots the rest of the dope." The next *738 morning while hitchhiking they were spotted by the police, ran into the woods, jumped a fence behind a house, and Hicks threw the gun away. It was to this area that the inmate Hosey, the sheriff, and a deputy went in December and the gun was found.
Scruggs testified in his own behalf. His testimony tracked his earlier statement in that he said Hicks shot the men while he watched frozen. He gave no explanation as to how the victim Roberts received the multiple stab wounds. Scruggs denied that they were on drugs that night.
Co-defendant Hicks testified in rebuttal. Hicks earlier had pleaded guilty to two counts of murder and received two life sentences in connection with the killings. Hicks testified to the following: he and Scruggs made plans to rob the young men during one of the several stops they made after being picked up; Hicks had a revolver and Scruggs had a knife, both of which came from a house burglary they had committed two days before the crime. Hicks testified further that Scruggs put the victims in the trunk while he held the gun on them. Hicks' version was that he and Scruggs talked and agreed that they had to kill the men: "We had a discussion about who was going to stab 'em and who was going to shoot 'em, and I had the gun on me. At this time I had got it back from Joe. He said, `Since I haven't ever stabbed anybody, I'll use the knife'." Hicks related how Scruggs tied the knife onto his right hand with the bandana and they opened the trunk, and he began shooting and Scruggs began stabbing. According to Hicks, Roberts was fighting Scruggs and trying to come out of the trunk, and so he shot him and then shot the other young man. Hicks also denied that they were taking drugs that night.
Fare v. Michael C., 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) held that it was proper to apply the totality-of-the-circumstances approach in determining whether a juvenile had effectively waived his rights. In the case now before us there was conflicting evidence as to whether the confession of the defendant was voluntary, but we have held numerous times that such conflicts are to be resolved by the presiding trial judge. The trial judge's finding that Scruggs' statement was voluntary was supported by substantial evidence. Argument that the defendant was being held incommunicado is without merit. Clear evidence is that on several occasions the defendant was allowed to use the phone in an attempt to communicate with his mother, and he was seen at the hospital by a doctor and others where he was given tests and observed. Careful examination of the testimony and the totality-of-the-circumstances revealed by the record causes us to conclude that the defendant's confession was proven beyond a reasonable doubt to be voluntary and not the result of any form of physical abuse, or psychological coercion, or delay for a preliminary hearing, or of anything other than the defendant's free will. The defendant here was a literate 16-year old young man, and there was no indication that he had any mental deficiencies or health problems. Evidence accepted by the court was that the defendant was not abused, but that he was informed of his rights sufficiently before he gave any inculpatory statement. Our ruling is that the lower court did not err in overruling the defendant's motion to suppress the incriminating statements made against his own interests, or in allowing the jury to hear these statements.
Another argument made by the defendant on his appeal is that sentencing him to life imprisonment "under Mississippi Code Annotated § 43-21-159(3) constituted a denial of his constitutional rights because that statute provided the sentencing judge with no standards to make such a determination." We find no merit in this argument. Mississippi Code Annotated § 97-3-21 (Supp. 1981) is obviously the statute upon which Scruggs' sentence was based. This is pointed out by the state in its brief to which no reply was made by the defendant in his rebuttal brief, and we cannot order reversal on account of the alleged unconstitutionality of § 43-21-159(3). The defendant's argument *739 as to this proposition is not easily understood. Apparently he argues that there are no written standards to guide a trial judge as to whether the trial judge should sentence a juvenile charged with murder under § 43-21-159(3) or under § 97-3-21.
Section 43-21-159(3) allows for alternative sentencing of juveniles convicted in circuit court. It provides in pertinent part:
[I]f any child shall be convicted by any circuit court, the trial judge, if he deems it for the best interest of such child and the public welfare, may, in his discretion, and in lieu of other statutory punishment, commit such child to any state institution now or hereafter established for delinquents, or may commit such child to the county jail for any term not in excess of one (1) year, or he may suspend sentence and release on probation, under such terms and conditions as he may prescribe,... . (Emphasis added).
Section 97-3-21 provides:
Every person who shall be convicted of murder shall be sentenced by the court to imprisonment for life in the state penitentiary.
Every person who shall be convicted of capital murder shall be sentenced to death or to imprisonment for life in the state penitentiary.
Whatever discretion was vested in the trial judge, the record shows that the sentencing judge exercised his discretion and considered alternatives under § 43-21-159(3). The judge stated:
The court feels that  and finds that the offense was done in a particularly heinous manner, that this was a crime against people as compared to one solely against property, that you are in the upper edge of the age range between 13 and 18, and that those in connection with my decision would be considered aggravating or damaging to determination against you, and for that reason I would not utilize or invoke the discretion that I have under this act to sentence you to anything other than life imprisonment. That would be my sentence and is at this tiem [sic].
May v. State, 398 So.2d 1331 (Miss. 1981) dealt with § 43-21-159(3). There the defendant May was a fourteen-year old retarded youth, and we affirmed his conviction but remanded with directions that the trial judge "consider those alternatives enumerated in" § 43-21-159(3). Section 43-21-159(3) was also focused upon in Bougon v. State, 405 So.2d 101 (Miss. 1981), where remand was ordered for clarification of sentence. In the present case the defendant was sixteen years old when tried, and the record shows from the court's language last quoted above that he seriously considered the alternatives of § 43-21-159(3).
Last argument asserted by the defendant in his appeal is that the state committed reversible error in its failure "to provide exculpatory material requested by the defense." He cites Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) in support of this proposition. The information which Scruggs claims was not disclosed was a statement which the prosecution obtained from Richard Crane of Mobile who said that he had a .38 caliber revolver stolen from his home and he "suspected" Hicks of stealing it. According to Crane, the burglary of his home occurred during the end of November or the first of December, 1979.
Crane was on a list of possible witnesses to be called by the state, which the state furnished to the defendant. After the state rested without calling Crane, the defendant asked the court for additional disclosure. Defense counsel stated he had not been specifically told that Crane would testify but he "assumed" he would.
The prosecutor responded that he did not call Crane because Crane's gun had not been identified by serial number as the one used to commit the murders. According to the prosecutor, a check on the gun traced it to Crane who did not take down the serial numbers. The prosecutor responded that Crane, therefore, could not testify as to whether the gun found by Wayne County authorities and introduced as the probable murder weapon was his.
*740 Defense argument is that the fact that the burglary apparently occurred approximately a month after the murders was highly exculpatory because it went to the credibility of the inmate Hosey who led police to where the gun was found based upon a conversation he said he had with Scruggs. The defense moved for a mistrial because of the failure to disclose Crane's statement concerning the revolver. Defense counsel stated he had undertaken to interview Crane but Crane would not talk to him. There is no indication that any effort was made by the defense to compel Crane's appearance in court by using the Uniform Witness Attendance Law or any compulsory process returnable to the trial in chief or to the hearing on the motion for a new trial.
In overruling the motion for a mistrial, the court stated that even if Crane were allowed to be called as a witness his testimony would be inadmissible because it involved conjecture or speculation that Hicks stole the pistol.
Defense counsel then made an oral motion for continuance to allow him time to secure Crane as a witness. The oral motion was not supported by any affidavit or sworn testimony of any kind. He told the court he had contacted Crane the night before when the state indicated it was not calling Crane as a witness. The court then directed the clerk of the court to contact Crane by phone and advise him of the court's need for him to testify. Then the defense put on a day's testimony, and next day the clerk told the court she had tried to call Crane at the number provided by the defense four times and was unable to reach him. At this point, the defense made another oral motion for continuance (again unsupported by proof) to secure Crane's presence. His motion was denied, and the defense rested.
The state argues that the information came to the attention of the defense during the trial giving him time to secure Crane's presence as a witness. According to the state Scruggs should not be allowed to argue the denial of the continuance as error since the denial was not specifically assigned as error under Miss.Sup.Ct. Rule 6(b) (1976). The state says even if such an argument is allowed to be made it should be denied because the granting of a continuance is a matter resting in the broad discretion of the trial judge. Correctly the state points out that this Court has repeatedly refused to find an abuse of discretion when a motion for continuance does not comply with Mississippi Code Annotated § 99-15-29 (1972) which requires the movant to support such a motion with "facts" in affidavit form not done here.
Regardless of whether the continuance should have been granted, upon the record this part of the defendant's argument lacks persuasion because it is clear that the testimony of the absent witness would not have created a reasonable doubt of Scruggs' guilt. In United States v. Agurs, supra, the United States Supreme Court held that a new trial should be ordered only if the withheld material created "a reasonable doubt that did not otherwise exist... ." 427 U.S. at 112, 96 S.Ct. at 2401. The Court said the omitted evidence should be evaluated in the context of the entire record and if there is no reasonable doubt about guilt, with or without the additional evidence, then "there is no justification for a new trial." Id. at 113, 96 S.Ct. at 2402.
In the instant case the trial judge overruled the defense's motion for a mistrial for the reason that Crane's testimony would be inadmissible even if he were present to testify. According to the state's information, Crane told officers that he bought a .38 caliber revolver and that it was stolen in November or December, 1979. He said he "suspected" Hicks was the culprit. Not having recorded the serial numbers of the weapon, it does not appear that Crane could testify beyond a reasonable doubt that the weapon found at the direction of inmate Hosey was his (Crane's). Thus, Crane's testimony would be of little, if any, use to Scruggs and certainly would not create a reasonable doubt of his guilt. Evidence of Scruggs' guilt of the crime charged is very great, and the sufficiency of the evidence is not even attacked here by Scruggs.
*741 Careful review of this record reveals that the evidence against the defendant is obviously overwhelming, and establishes his guilt beyond a reasonable doubt. As is usually the case, he was not given a perfect trial, but he was given a fair trial. The record clearly shows that he was represented by able and experienced counsel who vigorously represented him in a commendable manner. No reversible error having been shown, affirmance of the conviction and sentence is required.
AFFIRMED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, LEE, BOWLING and HAWKINS, JJ., concur.

APPENDIX

VOLUNTARY STATEMENT

DATE Oct. 30, 1979 PLACE Chiefs Office Waynesboro. MS. TIME STARTED
 7:26 P.M. I, the undersigned Joseph Dewayne Scruggs , am
 16 years of age, having been born on 7-18-63 , at
 Meridian, MS. 
I now live at Rt. 1, Box 165 A. Satsuma, Ala. 
I have been duly warned and advised by H.M. Hooks a person who has
identified himself as a state investigator , that I do not have to make
any statement at all, nor answer any questions or do anything that might
tend to go against me or incriminate me in any manner, and that any
statement I make, can and will be used against me on the trial or trials
for the offense or offenses concerning which the following statement is
herein made. I was also warned and advised of my right to the advice and
presence of a lawyer of my own choice before or at any time during my
questioning or statement I make, and if I am not able to hire a lawyer I
may request and have a lawyer appointed for me, by the proper authority,
without cost or charge to me.
I do not want to talk to a lawyer, and I hereby knowingly and purposely
waive my right to the advice and presence of a lawyer before and during
any questioning or at any time before or while I voluntarily make the
following statement to the aforesaid person, knowing that anything I say
can and will be used against me in a court or courts of law.
I declare that the following voluntary statement is made to the aforesaid
person of my own free will without promise of hope or reward, without fear
or threat of physical harm, without coercion, favor or offer of favor,
without leniency or offer of leniency, by any person or persons whomsoever.
Written by H.M. Hooks at request of Joseph Dewayne Scruggs. 
 On Sunday, Oct. 28, 1979 around 8 or 9 o'clock, Dennis Hicks and myself
were on 1-65 at Mobile, Ala. trying to catch a ride to Meridian, Miss. A
Monto-Carlo blue in color with a T-Top with 2 W/M's stopped, I think it was
a 79 model. The passenger asked us where we were going and I said Meridian.
He said come on we are going that way. We then went up the ramp and went to
8-mile Ala. to a Gulf oil service station. We bought $10.10 worth of gas
and the passenger paid for it with a credit card. This was around 9:00
o'clock or later. We then proceeded North on Hi-Way 45 toward Meridian. We
were all talking about songs and those things. The driver had told us his
name was Richard or something and the passenger said his name was Ricky or
Richard or something like that. We all got quite for app. 30 minutes and
the passenger went to sleep. Before he had gone to sleep, he had put his
hand real close to the drivers leg and asked him "Are you still mad at me
baby?" We then stopped the car and the driver, Dennis and myself got out
and used the bathroom. We were between Citronelle and 8-mile Ala. We had
stopped at a 76 service station with a grocery store in it. The driver used
the bathroom in front of the car, but Dennis and myself went behind the
service station. It was closed at this time. We then headed North again.
Dennis then asked the 2 boys where they were from. The driver said he was
from Jackson and the passenger said he was from Newton. Dennis then asked
me what I was going to do
*742 tomorrow night when I got back. I told him I didn't know. We then just
started talking about songs and etc. The passenger was asleep at this time.
I then asked the driver to pull over so I could use the bathroom and Dennis
said he had to go too. The driver said he needed to get a drink or
something from the trunk so we pulled over. I saw a car coming so I told
the driver to pull down that side road cause that car might be the police
and they don't like for you to use the bathroom beside the road. The driver
then pulled down the road a little piece. I got out first when the driver
leaned forward and released the seat, because I was sitting behind him.
Then the driver got out and streached, and Dennis got out last. We all got
out on the drivers side. I went to the front and used the bath room beside
the road. The driver went back and opened the trunk. I was still at the
front of the car and I heard a gun shot. I think Dennis fired over the
drivers head. I then heard Dennis say "Bitch get in the trunk." He threw a
lot of stuff out of the trunk so he could get in. I then heard him moaning
and crying from the trunk, but I couldn't see what Dennis was doing. I had
walked back to the drivers door at this point and the passenger got out and
said "Whats going on?" Dennis then told him to get in the trunk. He then
got in beside the driver who was already in the trunk. Dennis then closed
the trunk and asked me to help push the car off the road. I helped him push
the car off the road. I didn't hear the 2 people saying anything. I asked
Dennis what he was going to do and he didn't say anything. Then Dennis
opened the trunk and started shooting. He shot 3 or 4 times. He then closed
the trunk and said "let's run." Dennis then picked up some of their stuff
and started going through it. He had it under the hood of the car so he
could use the hood light. Two vehicles come by about this time. One was a
pick-up truck but I didn't see the other one. Dennis threw a lot of their
stuff out in front of the car and one suitcase to the right of the car on
the passenger side. Dennis got the billfold from the glove compartment. He
went through it and threw it to me and I put it on the seat. He then took
it and threw it up in the trees and I didn't hear it hit the ground. When
we first stopped at this place, I had looked at the car clock and it was
12:04 A.M. When we left the scene and started South on Hi-Way 45, it was
app. 15 minutes later. From the time of the shooting till now, I never saw
the gun again. I know it was a blue steel, short barrel, revolver, with
brown handles, but I don't know the brand name of it. It was a 38 Cal. When
we walked past the first house on the right south of the shooting, Dennis
said "I got one bullet left" and put it in his top jacket pocket. He then
put his hand in his pocket and handed me $5.00. Later we came to a house
and it was empty except for a old bed. We slept there and stayed till about
9:00 o'clock the next morning. We then went to a store and bought some
chocolate milk and some cookies. I also bought some cigarettes. I paid for
mine and walked outside. We continued south and stopped at another colored
ladys house. We got water but no ride. We left walking south. The next
house we stopped at, we got a ride with Buck Worsham to Buckatunna, Miss.
We went into the woods just south of there and when we came out on the
hi-way again, we saw the police car and we ran. They caught us at this
point. 
__________________________________________________________________________
__________________________________________________________________________
__________________________________________________________________________
__________________________________________________________________________
__________________________________________________________________________
__________________________________________________________________________
__________________________________________________________________________
__________________________________________________________________________
I have read this statement consisting of 4 page(s), and I certify that
the facts contained therein are true and correct. I further certify that I
made no request for the advice or presence of a lawyer before or during any
part of this statement, nor at any time before it was finished did I
request that this statement be stopped. I also declare that I was not told
or prompted what to say in this statement.
*743 This statement was completed at 8:26 P.M. on the 30 day of Oct. ,
1979.
WITNESS: H.M. Hooks 
 Joe Scruggs 
 Signature of person giving voluntary statement
WITNESS: Marvin Farrior 
 Sammy Windham